[Cite as *Lehigh Gas-Ohio L.L.C. v. Cincy Oil Queen City, L.L.C.*, 2014-Ohio-2799.]

# IN THE COURT OF APPEALS
## FIRST APPELLATE DISTRICT OF OHIO
## HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| LEHIGH GAS-OHIO, LLC, | : | APPEAL NO. C-130127 |
| | | TRIAL NO. A-1104166 |
| Plaintiff-Appellant, | : | |
| vs. | : | |
| CINCY OIL QUEEN CITY, LLC, | : | |
| and | : | |
| CINCY OIL HOPPLE ST., LLC, | : | |
| Defendants-Appellees. | : | |
| _____ | : | |
| | | TRIAL NO. A-1106892 |
| LEHIGH GAS-OHIO, LLC, | : | |
| Plaintiff-Appellant, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| SOLOMON BELAY, | : | |
| Defendant-Appellee. | : | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed from is: Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: June 27, 2014

*Dinsmore & Shohl, LLP,* and *H. Toby Schisler*, for Plaintiff-Appellant,

*Gary F. Franke Co., L.P.A., Gary F. Franke, Benjamin, Yocum & Heather, LLC*, and *Bradford C. Weber*, for Defendants-Appellees.

Please note: this case has been removed from the accelerated calendar.

**CUNNINGHAM, Presiding Judge.**

{¶1} Plaintiff-appellant Lehigh Gas-Ohio, LLC ("Lehigh"), appeals from the judgment of the Hamilton County Court of Common Pleas, following a bench trial, in these consolidated civil actions involving defendant-appellee Solomon Belay and Belay's companies, defendants-appellees Cincy Oil Queen City, LLC, and Cincy Oil Hopple St., LLC, which we collectively refer to as "Cincy Oil."

{¶2} Lehigh and Belay had entered into an agreement, memorialized in a letter of intent, involving the sale of the "business opportunity" at two convenience stores, both with gas stations, and AM/PM and Subway franchises, liquor permits, and tobacco licenses held by Lehigh. The business opportunity involved a long-term lease of the store properties and the agreement anticipated the change in ownership of the franchises, liquor permits, and tobacco licenses to Belay or his corporate entities. Belay formed Cincy Oil to operate the stores and a holding company, Belay Holdings, LLC, to manage Cincy Oil. He also paid a substantial amount of upfront "key money," including his obligation on two promissory notes, as a part of the agreement.

{¶3} Cincy Oil took over the stores before Belay or his corporate entities had obtained approval from the AM/PM and Subway franchisors to become franchisees for each location and before any change in ownership of the liquor permits and tobacco licenses. But Cincy Oil was able to operate the stores under Lehigh's franchise rights, tobacco licenses, and liquor permits. Cincy Oil defaulted under the leases when it failed to comply with the terms for the use of the liquor permits. The trial court evicted Cincy Oil after it had occupied and operated the stores for only 11 months.

{¶4} Lehigh, having retained the ownership of the franchises, liquor permits, and tobacco licenses, took over the operations of the stores and exerted only a minimal effort to secure a new lessee. Belay then defaulted on one of the promissory notes and Lehigh sued for its breach.

{¶5} Subsequently, the trial court held a bench trial on Lehigh's claim for damages related to the breach of the lease and the default under the promissory note, and Cincy Oil's and Belay's counterclaims related to the failed transaction. The trial court, treating Cincy Oil and Belay as unified defendants, determined that the plaintiff and the defendants had each materially breached the agreement and awarded damages for those breaches. After setting off those damages, the court entered judgment for the defendants collectively in the amount of $248,622.26.

{¶6} Lehigh argues that the trial court erred when it determined that it had breached the agreement and that the defendants could recover damages for that breach, and when it calculated the amount of the defendants' damages, which included a partial refund of the "key money," a full refund of the cost of inventory, a return of a security deposit for fuel, and compensation for security upgrades. Lehigh further contends that the trial court erred when it failed to award Lehigh the full amount of breach of contract damages it sought, which included amounts for unpaid sales and real estate taxes, the loss of rent, and the outstanding balance on a promissory note used to finance the transaction.

{¶7} We conclude that the trial court erred as a matter of law when it determined that Lehigh had materially breached the agreement and when it awarded damages to the defendants, including the partial forgiveness of the note, under a theory that Lehigh had materially breached the agreement. The trial court, however, did not issue factual findings with respect to whether the defendants were entitled to

a return of some of these amounts, regardless of their own material breach, under the terms of the contract or under a quasi-contract theory. We remand those issues to the trial court for its review and determination.

{¶8} We also hold that the trial court did not err by denying loss of rent damages and by awarding only $125,019 for the unpaid taxes. Accordingly, we affirm the trial court's judgment in part, reverse in part, and remand the cause for proceedings consistent with law and with this opinion.

## I. Background Facts

{¶9} Lehigh owned two convenience stores in Cincinnati with gas stations. One store was located on Queen City Avenue and the other on Hopple Street. Lehigh leased the land where the stores were located from its parent corporation. Lehigh owned liquor permits, tobacco licenses, and AM/PM and Subway franchises in connection with the stores, and operated the stores on its own.

## A. The Agreement

{¶10} In the spring of 2010, after a representative of Lehigh had contacted Belay about a business transaction involving these stores, Lehigh and Belay signed a nonbinding letter of intent for the purchase of the "business opportunity" at each store. This letter of intent anticipated Lehigh's transfer of the ownership of the liquor permits, the tobacco licenses, and the franchises to Belay, and the sublease of the store properties. Belay chose the Queen City Avenue and Hopple Street properties because he wanted to operate a business where he owned an AM/PM and a Subway franchise, a liquor permit, and a cigarette license. The parties understood that Belay had to be approved by the franchisors for the franchises to transfer.

{¶11}  As proposed in this letter of intent, Lehigh would receive a substantial sum upfront denoted as "key money" and, in addition, monthly rent.  Belay then formed Cincy Oil and Belay Holdings, and made a "key money" deposit of $100,000.

{¶12}  Several months later, in August 2010, before Belay had been approved as a franchisee by Subway or AM/PM, Belay, acting on behalf of Belay Holdings, and Lehigh signed several documents concerning the convenience stores, including subleases ("the leases") and liquor management agreements ("LMAs"). The leases were triple net leases, and obligated Cincy Oil, consistent with the letter of intent, to pay monthly basic rent of $7,119 at the Queen City Avenue location and $4,271 at the Hopple Street location.  Each lease was for a five-year term, with an option of renewability.  The LMAs were for a term expiring when the liquor permits transferred, but subject to earlier termination as specified, including after the passing of one year.

{¶13}  The leases and LMAs did not include any terms concerning the transfer of the franchises or mention the "key money."  But at the same time that the leases and LMAs were executed, Belay and Lehigh's representative, Don Meade, who negotiated with Belay the terms of the "business opportunity," signed a handwritten agreement captioned "Lease Agreement between Lehigh Gas-Ohio, LLC (Landlord) and Cincy Oil Queen City, LLC and Cincy Oil Hopple St., LLC, (Tenant)."  This document provided that "Landlord and Tenant agree and understand the following: (1) Security deposit $20,000 is the total security for fuel and lease; (2) McLane Distribution Agreement will not be executed; (3) Survivorship:  Agreed that Landlord and Tenant will review survivorship pending approval of LG-Ohio, AM/PM, and Subway."  The parties then provided that "[o]nce the above items are addressed, an addendum will be executed and added to final agreement."

5

{¶14} According to the defendants, the handwritten document resulted from Belay's conversations with Meade concerning Belay's reluctance to have Cincy Oil take over the stores before he had been approved as a franchisee. Belay contended that he had signed the documents after Meade had orally assured him that AM/PM and Subway would later approve him as a franchisee.

{¶15} After signing the leases, Belay made a series of payments to Lehigh, including two evinced by cashier's checks in the amounts of $150,000 and $49,210.01. The last check contained a notation indicating that it was in satisfaction of the balance owed for the inventory at both stores, which was valued at $99,210.91. Belay also paid a gas deposit of $40,000. Belay then executed two $50,000 promissory notes to Lehigh, which he was to repay in monthly installments.

## B. The Default

{¶16} Upon execution of the leases and the LMAs, Cincy Oil took over the operation of the stores. But problems soon arose in the relationship.

{¶17} The LMAs required Cincy Oil to operate the businesses under Lehigh's liquor permits until Cincy Oil had effectuated the transfer of the liquor permits from the state of Ohio's Division of Liquor Control. Because the owner of the permit was required to pay a tax to the state based on the alcohol sales, until the permit transferred, Section 11 of the LMAs required Cincy Oil to provide Lehigh with a monthly accounting of all alcohol sales and to remit to Lehigh amounts equal to the sales tax associated with the alcohol sales. This requirement ensured that Lehigh could pay the correct tax amount and remain in good standing with the state. The leases for both locations explicitly stated that Cincy Oil's failure to comply with the LMAs constituted a breach under the lease.

6

{¶18} Cincy Oil did not comply with the terms of Section 11 by providing Lehigh with the specified records and by remitting to Lehigh the required payments. At some point Belay tried to pay the sales tax on alcohol directly to the state authority, but the state rejected his payment because Belay had not filed the necessary paperwork to effectuate the liquor permit transfer.

{¶19} Cincy Oil, however, remained current on the monthly rental payments set forth in the lease. And Lehigh advanced to the state the monthly sales tax on alcohol, which it estimated from the reports that it had received as the franchisee of AM/PM. In January 2011, Lehigh began to withhold gas commissions owed to Belay to offset the tax payments that had accrued since the onset of the lease.

{¶20} In February 2011, Lehigh served Cincy Oil with a written notice advising it of its default and giving Cincy Oil notice to vacate the Queen City Avenue and Hopple Street stores. By that time, the parties had learned that Belay had failed the written exam necessary to become a Subway franchisee. AM/PM, however, had orally approved him as a franchisee. Lehigh notified AM/PM of Cincy Oil's default, and it is undisputed that AM/PM rescinded their approval at that time because of the default. Belay asked Lehigh to return his "key money" based on the failure of consideration because he did not receive ownership of the franchises, the liquor permits, or the tobacco licenses. Lehigh refused.

{¶21} Eventually, Lehigh served Cincy Oil a written notice pursuant to R.C. 1923.04 advising it of its default and instructing it to immediately vacate the Queen City Avenue and Hopple Street stores.

### C. The Eviction and Damages Claims

{¶22} On May 27, 2011, Lehigh filed a complaint for eviction and damages, including a claim for attorney fees, against Cincy Oil based on the breach of Section

7

11 of the LMAs, which resulted in the breach of the leases. Cincy Oil answered, raising several defenses, including the failure to mitigate damages. Cincy Oil asserted counterclaims under several theories of liability, which included breach of contract, unjust enrichment, tortious interference with contractual and business relations, and fraud. Cincy Oil alleged that Lehigh had breached the agreements as follows: (1) "by failing to transfer" the permits and licenses for the sale of liquor and tobacco products, (2) by "procuring a revocation of" AM/PM's and Subway's approval and transfer of the franchises, (3) by "failing to work with [Cincy Oil] in a timely manner with respect to matters related to the operation of the business," and (4) by "retaining ATM [commissions], gas revenue commissions, and McLane rebates."

{¶23} With respect to the unjust-enrichment claim, Cincy Oil alleged that Lehigh had received the benefit of money and improvements and that it would be unjust under the circumstances to allow Lehigh to retain those benefits.

{¶24} Cincy Oil based the tortious-interference claim on Lehigh's alleged interference with the transfer of the franchises. With respect to the fraud claim, Cincy Oil alleged that Lehigh's representative, Don Meade, had repeatedly assured Belay that AM/PM and Subway would approve Belay as a franchisee and that he would ultimately own and operate the franchises at the Queen City and Hopple stores.

{¶25} Cincy Oil sought various forms of relief, including monetary damages, rescission of the agreements and a return to the status quo, and injunctive relief, which pertained to the liquor permits and tobacco licenses. Lehigh denied the allegations in the counterclaims and raised several defenses, including that the claims were precluded or limited by the parol evidence rule or the statute of frauds.

{¶26} The court held a trial on Lehigh's eviction claims in July 2011. After finding that Cincy Oil was in default, and remained in default, of the obligations under Section 11 of the LMAs for the Queen City Avenue and Hopple Street stores, the court entered judgment for Lehigh on its forcible entry and detainer claims, and issued writs of possession for both stores.

{¶27} Cincy Oil then vacated the stores, leaving behind the inventory and gas, as well as two safes that Belay had installed to improve security. Lehigh immediately took over the operations of the stores. Other than listing the stores as available on a company website, Lehigh did nothing to secure a new tenant.

{¶28} Subsequently, Belay defaulted on one of the promissory notes used to finance the "key money." This event led Lehigh to sue on the note in a separate action that was later consolidated with the action for eviction and damages. Lehigh claimed that Belay owed $31,799.85 in principal and interest as a result of the default. In his answer, Belay admitted that a note had been executed, but stated that the note was "part of a broader business deal that did not go through as contemplated and bargained for." Belay asserted counterclaims similar to the counterclaims asserted by Cincy Oil in the other action.

### D. The Damages Trial

{¶29} In November 2012, the court held a trial on Lehigh's damages claims and the defendants' counterclaims. Robert Brecker, the Vice President of Retail Operations at Lehigh, was the only witness for Lehigh. Relying on a summary created by Lehigh's accountant, Brecker testified that Cincy Oil owed $182,950 for expenses that Lehigh had incurred as a result of Cincy Oil's breach of the leases and the LMAs. This amount included the alcohol sales tax incurred since August 2011 and other operating expenses that Cincy Oil had failed to pay beginning in January of

9

2011. These operating expenses included real estate taxes and a "tax" on Subway and AM/PM sales, which Brecker alternatively described as a franchise royalty fee and a commission.

{¶30} Brecker also testified that Belay had defaulted on the promissory note and owed a balance of $31,799.85, which Lehigh sought as damages. Finally, Brecker testified that Cincy Oil had failed to pay the basic rent payments since the eviction and that the stores had not been relet, but that Lehigh had earnestly taken over the operation of the stores. The court admitted into evidence Lehigh's profit and loss statements for the Queen City Avenue and Hopple Street locations from January 2010 through September 2012, the last month for which Lehigh sought to recover unpaid rent.

{¶31} Brecker acknowledged that, beginning in January 2011, Lehigh had withheld gas commissions owed to Cincy Oil in the amount of $67,631.53, and that Belay had paid a substantial amount of "key money" that Lehigh had never refunded. Brecker contended that the "key money" was not refundable because Lehigh intended that the "key money" bought only the opportunity to operate the business, which would include the transfer of the franchises and the liquor permit only if the purchaser qualified. But Brecker did not identify any written document containing a specific term that entitled Lehigh to keep the "key money" if the ownership of the franchises, liquor permits, and tobacco licenses did not transfer.

{¶32} Brecker conceded that he was not aware that anyone on behalf of Lehigh had actually told Belay that he might not receive ownership of the franchises as a part of the deal. Further, he testified that when Lehigh had purchased the subject locations, the transfer of the Subway and AM/PM franchises to Lehigh had

10

been material conditions of the purchase because of the value that the franchises added to the locations.

{¶33} Belay, the only witness to testify for the defendants, testified that he had specifically chosen the Queen City Avenue and Hopple Street locations because he had wanted to operate a store as owner of AM/PM and Subway franchises and as the holder of a liquor permit and tobacco license. He further contended that these items were valuable and that the "key money" reflected the value of the business opportunity with him as the owner of those assets. Belay testified that before he signed the leases, Meade had orally assured him that the franchises would transfer. This testimony was not refuted.

{¶34} Belay, however, like Brecker, could not point to any express contractual provision governing the "key money" in the event that he did not obtain ownership of the franchises, liquor permits, and tobacco licenses.

{¶35} Belay conceded that he had not complied with Section 11 of the LMAs and that he owed Lehigh for some alcohol sales tax, but he claimed that he owed no more than $120,000 based upon his knowledge of the monthly sales during the period in question. He also claimed that Lehigh had had the authority to debit any funds owed by Cincy Oil, including the sales tax funds, directly out of Cincy Oil's bank accounts, and that Lehigh had in fact done that with respect to some of the expenses that it claimed as damages.

{¶36} Belay testified that Lehigh had not transferred the liquor permits and the tobacco licenses and that it had prevented the transfer of the AM/PM franchise, in breach of the agreements. He further explained that Cincy Oil had vacated the stores as ordered by the court, but Cincy Oil was not compensated for the inventory and security upgrades left at the stores nor given a refund of the fuel deposits.

{¶37} As "breach of contract, rescission, and/or unjust enrichment damages," the defendants sought a return of the "key money," including the forgiveness of the promissory note, and compensation for the inventory, the security upgrades, and the fuel deposits.

### E. The Trial Court's Decision

{¶38} The court determined that Lehigh and the defendants had materially breached the agreements. In its factual findings,[1] the trial court identified Lehigh's material breach as its conduct in "tak[ing] steps to prevent [Belay] from getting the franchises." The trial court did not specifically identify the defendants' material breach in its factual findings, but we conclude that the material breach related to Cincy Oil's failure to comply with Section 11 of the LMAs, which resulted in a default under the leases and the eviction of Cincy Oil from the stores.

{¶39} As breach of contract damages, the court refunded to the defendants the cost of the inventory, the amount of the fuel deposits, the cost of the security upgrades that Cincy Oil had installed at the stores, and 50 percent of the "key money." These sums were to be offset by the amount of sales tax that Cincy Oil owed Lehigh and the amount of the unpaid commissions on gas sales that Lehigh had begun withholding in January 2011. The court further ordered that Lehigh pay interest on at least a part of this award from the date that it reoccupied the premises.

{¶40} The court awarded Lehigh the amount of $125,019 for unpaid sales tax, rejected the claim for unpaid rent based on the failure to mitigate, and allowed Lehigh to keep 50 percent of the "key money." The court stated that had Lehigh not

---

[1] The parties did not request findings of fact and conclusions of law, but the trial court sent the parties a letter, which it later journalized, that set forth its factual findings. Both parties rely on these findings, thus we treat the trial court's letter as a statement of the court's factual findings.

hindered Belay, "it almost certainly would be allowed to keep much more of this [key] money."

{¶41} The court specifically rejected the defendants' fraudulent inducement claim and dismissed the remaining claims and counterclaims of the parties. In total, after offsets, the court awarded Cincy Oil the amount of $236,823.44.

{¶42} Lehigh now appeals, challenging portions of the trial court's decision in three assignments of error. The first assignment of error relates to the defendants' counterclaims. Lehigh essentially argues that the trial court erred when it construed the terms of the agreement to find that it had breached and that the defendants could recover damages for that breach, and when it calculated the amount of the defendants' damages. Lehigh, however, does not dispute that Cincy Oil is entitled to a credit for the unpaid gas commissions. The second and third assignments of error relate to Lehigh's claims. Lehigh argues that the trial court erred when it failed to award any damages for unpaid rent, to award damages for the full amount of the unpaid sales and real estate taxes, and to award damages for the unpaid balance of the promissory note, plus interest.

## II. Standard of Review

{¶43} The various issues raised by Lehigh's assignments of error involve the application of different standards of review. This court reviews issues of law de novo. Issues of law include the interpretation of a contract, *Ignazio v. Clear Channel Broadcasting, Inc.*, 113 Ohio St.3d 276, 2007-Ohio-1947, 865 N.E.2d 18, ¶ 19, and a determination of the sufficiency of the evidence to support a judgment. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 11, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), paragraph two of the syllabus.

{¶44}  When addressing a challenge to the manifest weight of the evidence, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.  *See id.* at ¶ 20.  In weighing the evidence, we must presume that the findings of the trier of fact are correct, and if the evidence is susceptible of more than one construction, as a reviewing court, we must give it that interpretation that is consistent with the verdict or finding and judgment.  *See id.* at ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

### III. Material Breach and Duty of Good Faith and Fair Dealing

{¶45}  Lehigh's first assignment of error relates to the defendants' breach of contract counterclaim.  Lehigh argues that the trial court erred by determining that it had breached its contractual obligations to the defendants.  We review Lehigh's argument in the context of the trial court's determination that both parties had materially breached the agreements.

{¶46}  The trial court found that Lehigh had prevented Belay from receiving the Subway and AM/PM franchises.  Because the "transfer of the franchises was material" to the agreements, the parties expected that Lehigh would transfer ownership of the franchises to Belay upon approval, and that Cincy Oil would operate the franchises on the leased premises.

{¶47}  Although the agreements did not contain an express term concerning Lehigh's obligation to not interfere with an approval and transfer of the franchises, Lehigh was subject to the implied duty of good faith and fair dealing in its performance of the agreements.  *See, e.g., Littlejohn v. Parrish*, 163 Ohio App.3d

456, 2005-Ohio-4850, 839 N.E.2d 49, ¶ 27 (1st Dist.); *Wells Fargo Bank, N.A. v. Daniels*, 1st Dist. Hamilton Nos. C-110209 and C-110215, 2011-Ohio-6555, ¶ 14.

{¶48} This duty "requires * * * honesty * * * [and] reasonableness" in the performance and enforcement of a contract and " 'emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.' " *Littlejohn* at ¶ 26-27, citing Restatement of the Law 2d, Contracts, Section 205, comment a (1981); *see Stephan Business Ents. v. Lamar Outdoor Advertising Co. of Cincinnati*, 1st Dist. Hamilton No. C-070373, 2008-Ohio-954, ¶ 19. The duty does not, however, impinge upon a party's right to enforce a contract, nor does it require a party to put the other party's interest above its own. *Ed Schory & Sons, Inc. v. Francis*, 75 Ohio St.3d 433, 443-444, 662 N.E.2d 1074 (1996).

{¶49} We disagree with the trial court's determination that Lehigh had breached its duty with respect to the anticipated approval and transfer of the Subway or AM/PM franchises. First, there was no evidence that Lehigh had interfered with respect to the Subway franchises. It was undisputed that Belay had failed to qualify as a Subway franchisee because he had not obtained a sufficient score on the Wonderlic exam, a cognitive ability test.

{¶50} Second, the evidence with respect to the AM/PM franchises demonstrated only that AM/PM did not follow through with the approval of Belay as a franchisee because Cincy Oil was in default under the leases for the convenience stores and had failed to cure the default after notice from Lehigh. Although Lehigh had communicated to AM/PM the fact of Cincy Oil's default, we can only conclude that this communication was justified under these circumstances and not a breach of the contractual duty of good faith and fair dealing.

15

{¶51}  We arrive at this conclusion because it was undisputed that Lehigh had contacted AM/PM only after Lehigh had notified Cincy Oil of the default based on its repeated failure to comply with Section 11 of the LMAs.  As demonstrated in the record, Cincy Oil failed to comply with Section 11 from the beginning of the lease term and failed to comply with the provision after Lehigh had provided an opportunity to cure.  Because of Cincy Oil's default, Lehigh intended to and ultimately did evict Cincy Oil from the premises where the franchises were in operation.  Moreover, Brecker testified that Cincy Oil's default with Lehigh would have been a default under the franchise agreement with AM/PM, causing the franchise to revert back to Lehigh and subjecting Lehigh to a monetary penalty. Thus, the trial court erred by determining that Lehigh's communication to AM/PM was a material breach of the agreements.

{¶52}  We discern from the trial court's decision, however, that after finding that Lehigh had materially breached the agreements, it declined to consider the defendants' claim for restitution under alternative theories.  Thus, in the absence of factual findings by the trial court, this court is unable to determine whether the defendants would be entitled to a return of any of the "key money" and deposits, or compensation for the inventory or security upgrades, under the terms of the agreements or under a quasi-contract theory.  Therefore, we remand the cause for the trial court to make these factual and legal determinations.

{¶53}  Lehigh also contends that the evidence was insufficient to support the amount of the breach-of-contract damages awarded to the defendants.  For example, Lehigh notes that the evidence with respect to the payment for the inventory demonstrates that the trial court overstated the defendants' recovery by $50,000. We do not reach this issue because we are reversing the part of the trial court's

judgment that awarded damages to the defendants based on the court's erroneous determination that Lehigh had materially breached the agreements.

## IV. Lehigh's Breach-of-Contract Damages

{¶54} At trial, Lehigh had requested a total award of damages against the defendants in the amount of $419,960.67, which included an amount of sales tax and real estate taxes that Cincy Oil was contractually obligated to pay but allegedly failed to pay; unpaid rent, as mitigated by net profits received; interest on those amounts; and the amount remaining on the promissory note. The trial court awarded Lehigh the sales tax owed by Cincy Oil in the amount of $125,019 and rejected the claim for unpaid rent based on the defendants' defense of failure to mitigate. The trial court did not expressly award any amount for the promissory-note claim, but it did allow Lehigh to keep 50 percent of the "key money."

## A. Sales and Real Estate Taxes

{¶55} Lehigh argues that the trial court failed to fully compensate it for the sales and real estate taxes. Lehigh claims that the evidence on this issue was undisputed, citing to Brecker's testimony and Lehigh's exhibit P.

{¶56} In response, Cincy Oil does not dispute that it was obligated to pay the sales and real estate taxes as the lessee. It argues, however, that Lehigh did not present competent evidence demonstrating that Cincy Oil owed more than the $125,019 that the trial court awarded, and that competent credible evidence supports the trial court's decision. We agree with Cincy Oil.

{¶57} At trial, Brecker identified Lehigh's exhibit P, which summarized certain expenses, including sales and real estate taxes, that Cincy Oil was contractually obligated to pay but that Lehigh had allegedly paid on behalf of Cincy Oil. Lehigh's chief financial officer had created the summary based, in part, on sales

17

reports that Brecker had received from AM/PM and Subway and had forwarded to the CFO. He claimed that the real estate tax figures were based on tax bills. None of the underlying documents supporting the exhibit, however, were offered or entered into evidence. Moreover, the summary included some estimated figures. Brecker testified, relying on this summary, that Cincy Oil was delinquent in the amount of $182,950.

{¶58} The trial court admitted exhibit P into evidence over the objection of the defendants. The trial court stated that the absence of the underlying documents did not prevent the admission of the exhibit, but instead went to the weight to be given to the exhibit as evidence. In this respect, the trial court erred.

{¶59} Evid.R. 1006 allows "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court" to be "presented in the form of a chart, summary or calculation." For a summary to be admissible, the documents on which it was based must be admitted or offered into evidence or their absence explained. *Eysoldt v. Proscan Imaging*, 194 Ohio App.3d 630, 2011-Ohio-2359, 957 N.E.2d 780, ¶ 34 (1st Dist.).

{¶60} In this case, the documents on which the summary was based were not admitted or offered into evidence, and Lehigh did not explain their absence. Therefore, the summary was not admissible under Evid.R. 1006 to demonstrate Lehigh's damages.

{¶61} And Brecker's testimony standing alone on the issue of these damages was not persuasive. He admitted on cross-examination that he did not independently know how much Cincy Oil owed and that some of the figures were estimated. Further, Brecker's testimony concerning the amount of the delinquency

was confusing because he repeatedly interchanged the terms "franchise royalty fee" and "commission" with "tax."

{¶62} Conversely, Belay testified that based on his personal knowledge of the sales at the stores, the sales tax figures that Lehigh presented were too high. He also testified that Lehigh was not crediting him for expenses that it had debited from Cincy Oil's bank accounts. The defendants ultimately conceded that Cincy Oil owed $125,019 in unpaid and unreimbursed sale tax payments.

{¶63} Based on the state of the record, we find no error in the trial court's limitation of the award to $125,019. *See Eastley*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517.

### B. Loss-of-Rent Damages

{¶64} Lehigh argues that the trial court erred when it failed to award any damages for future rent due under the leases. Under the terms of the leases, after an eviction, Cincy Oil was potentially liable for rent coming due under the agreements, less the "net proceeds" of any reletting. Although Lehigh initially sought the full amount of unpaid rent, plus interest, Lehigh eventually settled on an amount that equaled the difference between the "net income" it received while operating the convenience stores, as demonstrated by the profit and loss statements, and the amount that Lehigh would have received from Cincy Oil's rental stream through September 2012, plus interest at 15 percent.

{¶65} The defendants argued that Lehigh had no loss-of-rent damages where it had taken over the operation of the stores after the evictions, or that if it had any damages, it was precluded from recovering those damages because it failed to mitigate by reasonable efforts where it did no more than list the property as available

on the Lehigh website. The trial court found in favor of the defendants on this issue and denied loss-of-rent damages.

{¶66} We agree with the trial court that Lehigh was not entitled to loss of rent damages under these circumstances. "Damages are not awarded for a mere breach of contract; the amount of damages awarded must correspond to injuries resulting from the breach." *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App.3d 137, 144, 684 N.E.2d 1261 (9th Dist.1996). In this case, Lehigh took the place of a replacement lessee by resuming operations of the stores. As the "replacement lessee," Lehigh assumed the fixed expense of rent but was entitled to all the net profits from those operations. Because Lehigh chose to step in and to operate the stores, we are satisfied that Lehigh has been fully compensated for the expected future income from rentals. We conclude that Lehigh would be overcompensated for the loss of rent if allowed to recover the additional sums it sought.

{¶67} Moreover, although the lease anticipated a setoff for the "net proceeds" of any reletting, it does not contain language indicating the parties' intent to allow Lehigh to resume operations but have Cincy Oil remain liable for the difference between the rental stream and the "net profits."

{¶68} Therefore, we agree with the trial court's denial of loss-of-rent damages.

## C. Promissory-Note Damages

{¶69} Lehigh argues that the trial court erred by not awarding it damages of $31,799.85, plus interest, associated with Belay's default under the promissory note. It is undisputed that Belay defaulted under the promissory note. But, to address

Lehigh's argument, we must first explain the origin of this debt and the trial court's treatment of the debt in its decision.

{¶70}   Belay incurred this debt as a part of the "key money" he provided in exchange for the business opportunity at the two locations.  The defendants argued that Lehigh was not entitled to recover on the outstanding promissory note, or keep Belay's payments on the extinguished note, due to Lehigh's breach of the agreements.  The trial court apparently accepted the defendants' argument in part when it awarded the defendants 50 percent of the "key money" as breach-of-contract damages.  However, the record demonstrates that the trial court erroneously failed to give Lehigh credit for the amount of the outstanding note when calculating the amount of the defendants' breach-of-contract damages.   Thus, the trial court intended to cancel at least a portion of this debt as a part of the defendants' breach-of-contract damage award.

{¶71} We have already held that the trial court erred when it found that Lehigh had materially breached the agreements by interfering with Belay's final approval by AM/PM for ownership of the franchises and, accordingly, have reversed the trial court's award of breach-of-contract damages based on that determination. Although we make no determination with respect to this issue, on remand, the trial court must decide the proper allocation of this debt when it readdresses Belay's claim for the return of the "key money" under the alternate theories presented.

## V. Conclusion

{¶72}  We sustain the first and third assignments of error for the reason that the trial court erred by determining that Lehigh had materially breached the agreement.  We overrule the second assignment of error, which involved Lehigh's

challenge to the limited award of damages for sales and real estate taxes and Lehigh's challenge to the trial court's denial of loss-of-rent damages.

{¶73} Accordingly, we affirm the trial court's judgment in part, reverse it in part, and we remand the cause to the trial court for further proceedings consistent with the law and with this opinion.

Judgment affirmed in part, reversed in part, and cause remanded.

FISCHER, J., concurs.
DEWINE, J., concurs in part and dissents in part.

DEWINE, J., concurring in part and dissenting in part.

{¶74} I dissent from the majority's treatment of Lehigh's claim for damages for lost rent under the leases. The majority holds that because Lehigh chose to occupy the premises and operate the businesses, it forfeited its claim for lost rental damages under the lease agreements. I disagree.

{¶75} Where a lessee defaults on a lease agreement, the lessor is entitled to lost rents subject to the lessor's duty to mitigate damages. *See Frenchtown Square Partnership v. Lemstone, Inc.*, 99 Ohio St.3d 254, 2003-Ohio-3648, 791 N.E.2d 417. Here, Lehigh chose to mitigate its damages by operating the businesses itself. Failure to mitigate is an affirmative defense that must be proven by the lessee. *Id.* at ¶ 21. There is nothing in the record to suggest that the manner in which Lehigh chose to mitigate its damages was unreasonable.

{¶76} We are required to calculate Lehigh's damages under basic principles of contract law. *Id.* at ¶ 19. That means we must put the nonbreaching party (here, Lehigh) in the position that it would be in but for the other party's breach. *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App.3d 137, 144, 684 N.E.2d 1261 (9th Dist.1996). The only way to do so is to award Lehigh the lost rents it would

have received over the life of the leases but for Belay's breach less the profits that it has earned and will earn from its own operation of the stores over the life of the leases. By holding otherwise, the majority ignores fundamental principles of contract law and deprives Lehigh of the benefit of its bargain.

{¶77} Furthermore, the majority creates perverse incentives for a lessor in Lehigh's position. Consider a lessor who has sought to find a replacement tenant but is unable to do so. That lessor would be better off not letting the property at all rather than occupying the property itself and obtaining some return. Thus, by not allowing the lessor to mitigate through its own use of the property, the majority approach actually makes the breaching party worse off.

{¶78} As is often the case, adherence to basic principles of contract law leads to the most economically rational result. I'd give Lehigh the benefit of its bargain.

{¶79} My colleagues see it otherwise, so I dissent from the portion of the majority's opinion that relates to Lehigh's claims for lost rents.

Please note:

The court has recorded its own entry on the date of the release of this opinion.