[Cite as *W. & S. Life Ins. Co. v. Bank of New York Mellon*, 2019-Ohio-388.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| THE WESTERN AND SOUTHERN LIFE INSURANCE COMPANY, | : | APPEAL NO. C-170476<br>TRIAL NO. A-1302490 |
| WESTERN-SOUTHERN LIFE ASSURANCE COMPANY, | : | *O P I N I O N.* |
| COLUMBUS LIFE INSURANCE COMPANY, | : | |
| INTEGRITY LIFE INSURANCE COMPANY, | : | |
| NATIONAL INTEGRITY LIFE INSURANCE COMPANY, | : | |
| and | : | |
| FORT WASHINGTON INVESTMENT ADVISORS, INC., | : | |
| Plaintiffs-Appellants, | : | |
| vs. | : | |
| THE BANK OF NEW YORK MELLON, | : | |
| Defendant-Appellee. | : | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: February 8, 2019

*Frost Brown Todd LLC, Matthew C. Blickensderfer, White, Getgey & Meyer Co., L.P.A., David P. Kamp, Jean Geoppinger McCoy, Wollmuth Maher & Deutsch LLP, David H. Wollmuth* and *Steven S. Fitzgerald*, for Plaintiffs-Appellants,

*Keating, Muething & Klekamp, PLL, James E. Burke, Ice Miller LLP, John P. Gilligan, Mayer Brown LLP, Matthew D. Ingber, Christopher J. Houpt* and *Michael Martinez*, for Defendant-Appellee.

**ZAYAS, PRESIDING Judge.**

{¶1} Countrywide Mortgage Loans, Park Granada Mortgage Loans, Park Monaco Mortgage Loans, and Park Sienna Mortgage Loans ("Countrywide") were mortgagees that loaned money to homeowners and then pooled the mortgage loans and sold them to a depositor, which would transfer them into trusts. These trusts were created to facilitate residential mortgage backed securities ("RMBS") transactions with Countrywide as seller. The depositor then transferred them to defendant-appellee Bank of New York Mellon ("BNYM"), which was the trustee. As trustee, BNYM issued certificates that entitled investors, or certificateholders, to income from the principal and mortgage payments collected by the master servicer, which received loan payments from the borrowers and serviced the loans. In this case, the mortgage servicer was a Countrywide affiliate, Countrywide Home Loan Servicing LP. BNYM also held the mortgage documentation for the loans. These mortgage files were supplied by Countrywide after the closing of the loans. Ultimately, BNYM would distribute payments to certificateholders. Plaintiff-appellants Western and Southern Life Insurance Company, Western-Southern Life Assurance Company, Columbus Life Insurance Company, Integrity Life Insurance Company, National Integrity Life Insurance Company, and Fort Washington Investment Advisors, Inc., ("W&S") purchased certificates representing bundles of these mortgages with a face value of $538 million. The RMBS and the parties were governed by a "Pooling Services Agreement" ("PSA"), which set out the rights and obligations of the parties to the RMBS trusts.

{¶2} A substantial number of Countrywide's homeowners defaulted on their loans, and W&S estimated that it suffered losses of approximately $100 million.

3

W&S sued BNYM alleging that the losses resulted because BNYM had breached the PSA.

{¶3} W&S argued that sections of the PSA obligated BNYM to force Countrywide, as seller, to cure defects in mortgage loan files and to cure breaches in representations and warranties made about the mortgage loans it was selling. If Countrywide did not cure the defect, it was to repurchase the loan or replace it with a different one. W&S argues that because BNYM did not enforce the provisions requiring Countrywide to replace or repurchase loans, W&S ended up with trusts that had more mortgages which defaulted. BNYM argued that, as trustee, its duties were very limited and that it did not breach any of its duties under the PSA.

{¶4} After a bench trial, the court below found that BNYM did not breach its obligations under the PSA and that W&S did not establish its claim for damages for the breach-of-contract claims.

{¶5} W&S presents four assignment of error in this appeal. We note that Section 10.03 of the PSA contains a clause in which the parties agreed to a New York choice-of-law provision, so New York law governs the substantive issues of this appeal. In addition, the appellate briefs refer to exhibit 148 as an exemplar for the PSAs, but the trial court refers to exhibit 147 in its decision. While the exhibits are substantively similar, this court will reference the PSA marked as exhibit 147, as that is the one the trial court referenced in making its determinations.

{¶6} This court reviews the interpretation of a contract de novo. *Ignazio v. Clear Channel Broadcasting, Inc.*, 113 Ohio St.3d 276, 2007-Ohio-1947, 865 N.E.2d 18, ¶ 19. We determine the sufficiency of the evidence to support a judgment under *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 11. *See*

*Lehigh Gas-Ohio L.L.C. v. Cincy Oil Queen City, L.L.C.,* 1st Dist. Hamilton No. C-130127, 2014 -Ohio- 2799, ¶ 43-44.

## I. DUTIES OF THE TRUSTEE

{¶7} Section 8.01 of the PSA divides the duties of the trustee into two parts, before an event of default and after an event of default. What constitutes an event of default is defined by section 7.01 and includes various situations in which the master servicer fails to perform its duties. None of the events of default are triggered by the seller, Countrywide.

{¶8} Prior to an event of default, the trustee's duties are limited to those specifically delineated by the PSA in section 8.01, which states that the trustee "shall undertake to perform such duties and only such duties as are specifically set forth in this Agreement."

{¶9} After an event of default, the trustee's duties become elevated, and it "shall exercise such of the rights and powers vested in it * * * and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs."

{¶10} Unlike common law trusts where a trustee has a fiduciary duty to act solely in the interests of the beneficiaries, an indenture trustee's duty is strictly defined and limited to the terms of the agreement. *Royal Park Invest. SA/NV v. HBSC*, 109 F.Supp.3d 587, 597 (S.D.N.Y.2015). This is true regardless of whether the trust is an indenture trust or a PSA. *Id.* An RBMS is a type of asset-backed security ("ABS"). An ABS is a security whose value is derived from a specified pool of underlying assets. *Gearren v. McGraw-Hill Co., Inc.,* 690 F.Supp.2d 254, 273, (S.D.N.Y.2010), fn. 2. Accordingly, in reviewing the issues before us, the development of the law governing ABSs will serve as a framework for our analysis.

5

{¶11} The Trust Indenture Act of 1939 ("TIA"), 15 U.S.C. 77aaa et seq., was enacted after reports to Congress from the Securities and Exchange Commission found that the "national public interest and the interest of investors" in notes, bonds, and debentures were adversely affected when trustees were not protecting and enforcing the rights and the interests of investors. 15 U.S.C. 77bbb(a). Congress wanted to regulate certain types of ABSs in order to provide uniformity and to protect the public and the interests of investors. *AG Capital Funding Partners, L.P. v. State Street Bank and Trust Co.,* 11 N.Y.3d 146, 156, 896 N.E.2d 61 (2008).

{¶12} Although the TIA does not apply to RMBSs, the history of the act and the development of the law governing ABSs are germane to our analysis here. *See Retirement Bd. of the Policemen's Annuity and Benefit Fund of the City of Chicago v. Bank of N.Y. Mellon,* 775 F.3d 154, 162 (2d Cir.2014).

{¶13} When the TIA was introduced in the United States Senate, it provided for the mandatory inclusion of a provision requiring the trustee to perform its predefault duties in a manner consistent with that which a "prudent man would assume and perform." *See Elliot Assoc. v. Henry Schroder Bank and Trust Co.,* 838 F.2d 66, 70-71 (2d Cir.1988). The version of the TIA introduced in the House of Representatives, however, "excluded the imposition of a pre-default 'prudent man' duty on the trustee." *Id.* at 71. Instead, the version of the TIA passed states that an "indenture * * * may provide that * * * the indenture trustee shall not be liable except for the performance of such duties as are specifically set out in such indenture." 15 U.S.C. 77ooo(a)(1); *See Meckel v. Continental Resources Co.*, 758 F.2d 811, 816 (2d Cir.1985).

{¶14} The express terms of the TIA and its legislative history dictate that no implicit duties are imposed on the trustee predefault and, as long as a trustee fulfills

its obligations under the express terms of the indenture, no predefault duties are owed to debt holders except to avoid conflicts of interests. *See Elliot Assoc.* at 71; *AG Capital Funding Partners, L.P.,* 11 N.Y.3d at 156-157, 896 N.E.2d 61.

{¶15} Under New York law, the predefault duties of a trustee are limited to the duties imposed by the indenture, and the trustee resembles a party to a contract. *LNC Invest., Inc. v. First Fid. Bank, Natl. Assn.,* 935 F.Supp. 1333, 1346-1347 (S.D.N.Y.1996). "New York courts have imposed only two extra-contractual pre-default duties on indenture trustees." *Id.* at 1347. The first is that an indenture trustee must avoid conflicts of interest. The second is that the trustee may be liable in tort for not performing its basic nondiscretionary ministerial tasks. *Id.*

{¶16} After an event of default, however, an indenture trustee's obligations become more like an ordinary fiduciary. The trustee must act prudently to secure the repayment of the underlying obligation. *Id.* at 1347-1348.

{¶17} An indenture trustee is not subject to the ordinary trustee's duty of undivided loyalty. Unlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement. *Meckel,* 758 F.2d at 815.

{¶18} The language of the provisions in the PSA before us mirrors the language approved for other ABSs and it is against this background we consider the duties of the trustee in this appeal.

## II. PRIOR TO AN EVENT OF DEFAULT

{¶19} W&S's first assignment of error is that the trial court erred when it found that BNYM did not breach its duty to enforce Countrywide's obligation to repurchase the mortgage loans. W&S argues that the PSA obligated BNYM to require

7

Countrywide to substitute or replace the loans affected by the breaches of warranties and representations or those missing mortgage file documents. W&S also argues that BNYM breached its duties under the PSA because it had knowledge of warranty and representation breaches and missing loan documents but did not notify the other parties. W&S argues that BNYM should have provided notice to Countrywide so that it could cure the defect, or substitute or repurchase the loan.

{¶20}  W&S relies on two sections of the PSA, which require Countrywide, as seller, to substitute loans or repurchase loans.  Section 2.02 requires Countrywide to cure defects in loans with missing mortgage documents by supplementing the mortgage files with the documents.  If the missing documents are not provided, Countrywide must substitute the loans with new ones or repurchase the loans with incomplete mortgage files. Section 2.03 requires Countrywide to substitute or repurchase loans with breaches of representations, warranties, or covenants.  These warranties and representations were set out in schedules attached to the PSA and warranted, among other things, that "[t]he origination, underwriting and collection practices used by Countrywide with respect to each Mortgage Loan have been in all respects legal, prudent and customary in the mortgage lending and servicing business."

{¶21} While the PSA clearly obligates *Countrywide* to substitute or repurchase nonconforming loans, the PSA does not clearly assign any party the duty to enforce Countrywide's obligation.  Accordingly, the PSA contains no delineated obligation of the trustee to enforce remedies against the seller, Countrywide.

{¶22}  W&S points to section 2.06 of the PSA as requiring the trustee not only to hold the trust, but to also "exercise the Trusts' right to enforce Countrywide's repurchase obligations."  That section states:

SECTION 2.06. Execution and Delivery of Certificates.

The Trustee acknowledges the transfer and assignment to it of the Trust Fund and, concurrently with such transfer and assignment, has executed and delivered to or upon the order of the Depositor, the Certificates in authorized denominations evidencing directly or indirectly the entire ownership of the Trust Fund. The Trustee agrees to hold the Trust Fund and *exercise the rights referred to above* for the benefit of all present and future Holders of the Certificates and to perform the duties set forth in this Agreement, to the end that the interests of the Holders of the Certificates may be *adequately and effectively protected.*

(Emphasis added.) W&S argues that "the rights referred to above" are rights acquired by the trustee in section 2 from the depositor.

### a. Representations and Warranties

{¶23} Attached to the PSA are several schedules. Schedules II and III contain warranties and representations which are incorporated into the PSA in section 2.03. The schedule II warranties contain representations that Countrywide and its affiliates are duly authorized as New York or Delaware corporations, that they are in good standing, and that they have full corporate power to sell the loans, and to execute the PSA. The schedule III warranties certify that the mortgage loans are not delinquent, and are valid and enforceable first liens, that there are no delinquent tax liens or mechanics' liens, that improvements of the properties are covered by hazard insurance and that "[t]he origination, underwriting and collection practices used by Countrywide with respect to each Mortgage Loan have been in all respects legal, prudent and customary in the mortgage lending and servicing business."

**{¶24}** Two sections of the PSA transfer the depositor's right to require the seller to repurchase or substitute loans with breaches of representations or warranties.

**SECTION 2.01. Conveyance of Mortgage Loans.**

(b) Immediately upon the conveyance of the Mortgage Loans referred to in clause (a), the Depositor sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders, without recourse, all the right, title and interest of the Depositor in and to the Trust Fund **together with the Depositor's right to require each Seller to cure** *any breach of a representation or warranty* **made herein by such Seller, or to repurchase or substitute for any affected Mortgage Loan in accordance herewith.**

**SECTION 2.04. Representations and Warranties of the Depositor as to the Mortgage Loans.**

The Depositor hereby assigns, transfers and conveys to the Trustee all of its rights with respect to the Mortgage Loans including, without limitation, ***the representations and warranties*** of each Seller made pursuant to Section 2.03(a)(ii) hereof, **together with all rights of the Depositor to require each Seller to cure any breach thereof or to repurchase or substitute for any affected Mortgage Loan in accordance with this Agreement.**

(Emphasis added.)

10

{¶25} These provisions give BNYM the *right* to enforce the repurchase or substitution of mortgage loans in the event of a breach of the warranties or representations. W&S argues that they created an obligation that BNYM require Countrywide to substitute or repurchase loans. However, that interpretation contradicts the language of section 8.01(i) of the PSA, which explicitly provides that, prior to an event of default, "the duties and obligations of the Trustee shall be determined solely by the express provisions of this Agreement, the Trustee shall not be liable except for the performance of such duties and obligations as are *specifically set forth in this Agreement, no implied covenants or obligations shall be read into this Agreement against the Trustee* * * *." (Emphasis added.) The PSA is a contract, and when interpreting a contract, if any inconsistency exists between a general provision and a specific provision, the specific provision applies. *DeWitt v. DeWitt*, 62 A.D.3d 744, 745, 879 N.Y.S.2d 516 (2009), citing *Aguirre v. City of New York*, 214 A.D.2d 692, 693, 625 N.Y.S.2d 597 (1995).

{¶26} The language "exercise the rights referred to above for the benefit of all present and future Holders of the Certificates" and "to the end that the interests of the Holders of the Certificates may be adequately and effectively protected," does not clearly set out the detail required to impose a duty on BNYM. If the trustee's duties included the obligation to require Countrywide to substitute or repurchase mortgage loans, those duties would have had to have been specifically set forth in the PSA.

{¶27} We agree with the trial court's interpretation of the language in section 2.06. The phrase that requires the trustee to "exercise the rights referred to above for the benefit of all present and future Holders of the Certificates," delineates that the trustee holds the trust fund for the benefit of the investors rather than for the trustee's own benefit or the benefit of any other party to the PSA. This is also

consistent with New York laws that require indenture trustees to avoid conflicts of interest. *See LNC Invest., Inc.,* 935 F.Supp. at 1347.

{¶28} W&S relies on *Royal Park Invest. SA/NV v. Deutsche Bank Natl., Trust Co.,* S.D.N.Y. No. 14-CV-4394, 2016 WL 439020 (Feb. 3, 2016), to support the argument that BNYM had a duty to enforce repurchases of loans for breaches of representations and warranties. The PSA in that case, however, provided "that the Trustee 'shall give notice of [] breach to the Originator and request the Originator to substitute * * * or to repurchase' loans if it 'receives notice of a breach * * * of any of the representations or warranties.' " *Id.* at *4. In that case, the trustee was specifically designated as the party to request substitution and repurchase.

{¶29} W&S also relies on section 2.03(c) of the PSA for its argument. Section 2.03(c) states:

> Upon *discovery* by any of the parties hereto of a breach of a representation or warranty *with respect to a Mortgage Loan* made pursuant to Section 2.03(a) *that materially and adversely affects the interests of the Certificateholders in that Mortgage Loan,* the party *discovering* such breach shall give prompt notice thereof to the other parties.

(Emphasis added.)

{¶30} W&S argues that BNYM knew that Countrywide had breached the representations and warranties in the PSA and did not give prompt notice to the other parties after discovering it. Its argument is that BNYM had knowledge of breaches, that BNYM was required to give notice, and if Countrywide failed to cure such breach, Countrywide was required to "repurchase the affected Mortgage Loan or Mortgage Loans from the trustee at the purchase price."

{¶31} The evidence at trial showed that BNYM was sent letters and emails notifying it that a large number of Countrywide's loans were defaulting. Some of these allegations were based on the poor performance of the loans, which "evidenc[ed] breaches," public information about the residential mortgage crisis, and a settlement between Countrywide and several states' Attorneys General. Exhibit 311. None, however, informed BNYM of specific breaches of representations and warranties related to a particular loan. Under New York law, general allegations are insufficient to find that a trustee has violated a duty to notify the other parties to the PSA. Breaches must be proven loan-by-loan and trust-by-trust, not just by general allegations. *Retirement Bd. of the Policeman's Annuity and Benefit Fund of the City of Chicago*, 775 F.3d at 162. Under this provision of the PSA, a party only has a duty to notify the other parties to the PSA if it has *actual knowledge* of a breach of a representation or warranty with respect to an individual loan. *See Royal Park Invest. SA/NA v. HSBC Bank USA Natl. Assn.,* S.D.N.Y. Nos. 14-CV-08175, 14-CV-09366, 14-CV-10101, 15-CV-02144, 15-CV-10032 and 15-CV-10096, 2017 WL 945099, *6 (Mar. 10, 2017); *FHFA v. HSBC N. Am. Holdings, Inc.*, 33 F.Supp.3d 455, 477 (S.D.N.Y.2014). W&S's failure to prove at trial that BNYM had any knowledge of a specific breach of a representation or warranty related to any particular loan in a trust was fatal to its claim. *See Phoenix Light SF Ltd. v. BNYM*, S.D.N.Y. No. 14-CV-10104, 2017 WL 3973951, *8 (Sept. 7, 2017).

{¶32} As W&S was unable to establish that BNYM had knowledge of loan-specific breaches, W&S attempted to establish the breaches by sampling. The trial court found sampling to be an inappropriate method to establish representation and warranty breaches. Its decision was supported by prevailing law, because W&S was required to show specific loans, specific breaches, and whether or not the breaches

were material because "the cure and repurchase remedies * * * are themselves loan-specific." *Royal Park Invest. SA/NA* at *5-6 (court did not require the plaintiff to allege loan-by-loan breaches for the motion to dismiss, but stated that, ultimately, "to prevail on its claims Plaintiff must demonstrate such breach on a 'loan-by-loan and trust-by-trust' basis."). In addition, sampling does not "adequately distinguish between breaches that are material and adverse as to a particular loan and those that are not." *Id.*

### b. Incomplete Mortgage Files

{¶33} W&S argues that BNYM was also obligated to enforce Countrywide's duty under section 2.01 to repurchase loans with missing documents. It bases its argument on a prospectus (exhibit 2657), which listed the mortgage documents to be provided to the trustee to hold, such as the original mortgage note, the original instrument creating a first lien, an assignment in recordable form of the mortgage, the original or a copy of the title policy and, if applicable, all recorded intervening assignments and any riders or modifications. W&S refers to sections 36 and 43 of schedule III-A, which warrants that mortgage loans were "accurately described in the prospectus" arguably making this a claim for a breach of a representation or warranty, but the parties have addressed it separately.

{¶34} W&S argues that BNYM had an obligation to make Countrywide *repurchase loans*, not substitute them. The PSA, however, specifically states that the loans are to be repurchased *or substituted*. The PSA leaves the decision to Countrywide, and even specifies a preference for substitution. PSA section 2.01(c)(vi)(F) ("Countrywide * * * shall use its best reasonable efforts to effect a substitution, rather than a repurchase * * *."). Testimony at trial established that mortgage servicers would not have replaced a performing loan because it had

14

missing documents. Other testimony at trial also showed that any incomplete mortgage files would have been substituted with another, similar mortgage. Evidence also showed that replacement loans were just as likely to default, and that loans with complete mortgage files were just as likely to fail as loans with incomplete files. There was no correlation between complete and incomplete mortgage files and defaults. Therefore, even if BNYM could have forced Countrywide to replace the loans, the evidence below showed that the certificateholders would not have been "adequately and effectively protected" from the defaulting loans because it would not have made a difference.

{¶35} W&S's first assignment of error is overruled because the PSA did not obligate BNYM to effectuate the substitution or repurchase of loans, and BNYM did not have actual knowledge of a loan-specific breach of the representations and warranties.

### III. EVENT OF DEFAULT

{¶36} W&S's second assignment of error is that the trial court erred when it held that BNYM did not breach its duty to act prudently under section 8.01 of the PSA. Section 8.01 states:

SECTION 8.01. Duties of Trustee.

The Trustee, prior to the occurrence of an Event of Default and after the curing of all Events of Default that may have occurred, shall undertake to perform such duties and only such duties as are specifically set forth in this Agreement. **In case an Event of Default has occurred and remains uncured, the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their**

15

**exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.**

(Emphasis added.)

{¶37} W&S argues that there was an event of default because the master servicer, Countrywide Home Loans Servicing LP, was not providing complete mortgage files. As an indenture trustee, under New York law, BNYM's duties are governed solely by the PSA. *See Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F.Supp.2d 162, 191 (S.D.N.Y.2011). In addition, section 8.01(i) provides that "unless an Event of Default known to the Trustee shall have occurred and be continuing, the duties and obligations of the Trustee shall be determined solely by the express terms of the Agreement * * *." In an event of default, however, the trustee's duties become elevated to that of a prudent person under the circumstances. W&S claims that BNYM was aware of an event of default and should have investigated and acted to protect the certificateholders. An event of default by the mortgage servicer is defined in section 7.01.

SECTION 7.01. Events of Default.

"Event of Default," wherever used herein, means any one of the following events:

ii) any failure by the Master Servicer to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in this Agreement (except with respect to a failure related to a Limited Exchange Act Reporting Obligation), which failure materially affects the rights of Certificateholders, that failure continues unremedied for a period of

16

60 days after the date on which *written notice of such failure shall have been given to the Master Servicer by the Trustee or the Depositor,* or to the Master Servicer and the Trustee by the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates; provided, however, *that the sixty day cure period shall not apply to the initial delivery of the Mortgage File for Delay Delivery Mortgage Loans nor the failure to substitute or repurchase in lieu of delivery.*

(Emphasis added.)

{¶38} W&S argues that BNYM knew the master servicer was not providing complete mortgage files and was not requiring Countrywide to substitute or repurchase loans. W&S argues that "no additional notice to the Master Servicer or opportunity to cure is required under section 7.01(ii)" because "the sixty-day cure period does not apply to the initial delivery of the Mortgage File for Delay Delivery Mortgage Loans nor the failure to substitute or repurchase in lieu of delivery." That interpretation ignores the plain language of section 7.01(ii), which waives the sixty-day cure period but not the notice requirement.

{¶39} W&S also argues that BNYM should have sent the required notice to the master servicer and should not be able to avoid its duty to act prudently because of its failure to send notice to the master servicer. However, when a condition precedent is required to trigger a duty to perform, a party's nonperformance is charged to the party when the party's "active conduct" prevented or hindered the fulfillment of the condition. *Fixed Income Shares: Series M v. Citibank, N.A.*, 157 A.D.3d 541, 69 N.Y.S.3d 288 (2018). A party's failure to send notice to cure to a master servicer is not "active conduct". *See id.* at 542. Accordingly, BNYM's failure

17

to send notice to cure to the master servicer is not "active conduct," and the record does not show any active conduct by BNYM. Therefore, BNYM is not barred from asserting that notice was not properly sent. Moreover, the "Holders of Certificates evidencing not less than 25% of the Voting Rights" could have sent notice of the servicer's failure. In addition, W&S would impose on BNYM duties outside those delegated by the express language of the PSA in section 7.01(ii) and 8.01. *See Argonaut Partnership L.P. v. Bankers Trustee Co. Ltd*, S.D.N.Y. Nos. 96 CIV.1970 and 00 CIV.42344, 2001 WL 585519, *1 (May 30, 2001) (trustee was not responsible for supervising the other parties and was not required to monitor them).

{¶40} Significantly, the evidence at trial also established that BNYM did not receive notice of an event of default. Notice to a responsible officer of the trustee of an event of default is required by the PSA before the trustee's duty becomes that of a prudent person under the circumstances. Section 8.02(viii) provides that "the Trustee shall not be deemed to have knowledge of an Event of Default until a Responsible Officer of the Trustee shall have received written notice thereof." BNYM had no duty to act as a prudent person until it was given written notice of the event of default. *See id.* at *2; *Commerce Bank v. Bank of New York Mellon*, 141 A.D.3d 413, 35 N.Y.S.3d 63 (2016).

{¶41} W&S argues that BNYM had to act prudently whether or not there was written notice of an event of default, because an event of default was known to the trustee. However, an event of default is defined by the PSA and required written notice to the master servicer. As written notice was never sent to the master servicer, there was no event of default. In addition, BNYM's duty was not elevated because it was not sent the required notice to trigger it. W&S's second assignment of error is overruled.

18

## IV. DAMAGES

{¶42} W&S's third assignment of error is that the trial court erred when it held that W&S was not entitled to an award of substantial damages even if BNYM breached the PSA.

{¶43} This is a breach-of-contract claim. Under New York law there must be proof of (1) a contract; (2) performance by one party; (3) *breach by the other party*; and (4) *damages. First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir.1998).

{¶44} Our determination of the first and second assignments of error established that BNYM did not breach its duties as set forth in the PSA because it was not required to enforce Countrywide's obligations to substitute or repurchase loans. Failure to prove the essential element of damages is also fatal to a cause of action for breach of contract. *Fellion v. Darling*, 14 A.D.3d, 904, 907, 789 N.Y.S.2d 541 (2005); *First Investors Corp.* at 162.

{¶45} The trial court found that W&S did not establish that it suffered damages due to any breach of the contract. Specifically, "Plaintiffs presented no evidence that document defects caused losses on any single loan." The court also based its decision on expert testimony which demonstrated that W&S's other investment securities experienced a 97 percent loss, which was roughly the same as its 98 percent loss with Countrywide. In addition, W&S had experts testify as to its damages based on *repurchases* of the defective loans, which was not favored or required of Countrywide. The trial court's determination that W&S did not establish its claim for damages was supported by the evidence. We overrule the third assignment of error.

## V. STANDING FOR SOLD CERTIFICATES

{¶46} W&S's fourth and final assignment of error is that the trial court erred when it ruled that W&S lacked standing because it sold five certificates. New York and Ohio laws are similar on this issue and both states have statutes that give the purchaser or the transferee all rights or claims in the security. *See* New York General Obligations Law 13-107(1); R.C. 1308.16.

{¶47} Under New York law, once a holder of certificates transfers them, it loses standing to bring claims arising out of the certificates. *FDIC v. Citibank, N.A.,* S.D.N.Y. Nos. 1:15-cv-6574, 1:15-cv-6560 and 1:15-cv-6570, 2016 WL 8737356, *5 (Sept. 30, 2016), citing *Oklahoma Police Pension & Ret. Sys. v. U.S. Bank Natl. Assn.*, 986 F.Supp.2d 412, 415 (S.D.N.Y.2013) (applying New York General Obligations Law 13-107). Even if W&S had standing to bring these claims, our determination of the first and second assignments of error would prevent them from recovering on the five certificates. The fourth assignment of error is overruled.

## VI. CONCLUSION

{¶48} We find that the PSA did not obligate BNYM to enforce Countrywide's duty to repurchase or substitute mortgages with breaches of warranties or missing documents because, prior to an event of default, it did not have a specific duty set forth in the PSA to do so. BNYM also did not fail to give notice to the other parties, as it did not have actual knowledge of a loan-specific breach of a warranty or representation. We also find that there was no event of default because notice was not provided to the master servicer or to a responsible officer of BNYM, both of which were required under the PSA. Because we find that BNYM did not breach the PSA, W&S was not entitled to damages. In addition, W&S did not have standing to pursue the claims for five of its previously-owned certificates, because it sold them

and transferred any rights to the new certificateholders. The judgment of the trial court is affirmed.

Judgment affirmed.

**HANDWORK, J**., concurs.
**DETERS, J**., concurs in judgment only.

PETER M. HANDWORK, retired, from the Sixth Appellate District, sitting by assignment.

Please note:

This court has recorded its own entry on the date of the release of this opinion.