[Cite as *Wood Elec., Inc. v. Ohio Facilities Contr. Comm.*, 2017-Ohio-2743.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Wood Electric, Inc., | : | |
| Plaintiff-Appellee, | : | |
| | | No. 16AP-643 |
| v. | : | (Ct. of Cl. No. 2014-00987) |
| Ohio Facilities Construction Commission, | : | (REGULAR CALENDAR) |
| | : | |
| Defendant-Appellant. | : | |
| | : | |

N U N C   P R O   T U N C[1]
D E C I S I O N

Rendered on May 18, 2017

**On brief:** *Kegler Brown Hill + Ritter, LPA, Donald W. Gregory*, and *Michael J. Madigan*, for appellee. **Argued:** *Donald W. Gregory.*

**On brief:** *Michael DeWine*, Ohio Attorney General; *William C. Becker*, and *David A. Beals*, for appellant. **Argued:** *William C. Becker.*

APPEAL from the Court of Claims of Ohio

BRUNNER, J.

{¶ 1} Defendant-appellant, Ohio Facilities Construction Commission ("OFCC"), appeals a judgment of the Court of Claims of Ohio, entered on August 12, 2016, which found against the OFCC in the amount of $254,027. Because OFCC submitted no assignments of error and we find no merit in any of the OFCC's arguments, we affirm.

---

[1] We issue this decision, nunc pro tunc, to correct a minor typographical error in our May 9, 2017 decision where we used the word "consistent" instead of the word "inconsistent" in paragraph 38.

No. 16AP-643

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On February 19, 2013, the Dalton Local School District ("Dalton"), in connection with the OFCC, an architect (thendesign architecture, ltd. or "thendesign"), and a construction manager (Scaparotti Construction Group or "SCG"), issued a bidding package to invite bids to build a pre-kindergarten through eighth grade school. (Joint Ex. D.) The OFCC, Dalton, thendesign, and SCG are collectively referred to in the record as the "project team" or the "core."

{¶ 3} A number of bids were received on the project, but ultimately three prime contractors were chosen. Guenther Mechanical, Inc. (which plays no role in this case) was the mechanical contractor responsible for heating, ductwork, and machinery. (Pl.'s Ex. 31.) Plaintiff-appellee, Wood Electric, Inc. ("Wood"), was the electrical contractor, responsible for all wiring, fixtures, switches, teledata, technology (for which Wood hired a subcontractor), and fire alarm systems. *Id.* CT Taylor was the general trades contractor, responsible for construction of the building itself. *Id.* SCG's role as construction manager was to manage the prime contractors and advise the OFCC on the project in keeping on schedule and within budget. (Tr. Vol. 3 at 784.)

{¶ 4} CT Taylor and SCG were, at all relevant times, partners in a venture called ICON and collaborated on approximately $200 million in projects through that venture. (Tr. Vol. 2 at 441-44.) Without the partnership, in fact, SCG would not have obtained bonding capacity and would have been terminated from the Dalton project and others. (Tr. Vol. 2 at 444-46.)

{¶ 5} The bidding package contained a number of construction milestone dates. (Pl.'s Ex. 11.) Among these were dates for temporary enclosure and full building enclosure. *Id.* The contract governing the construction defined the two states of enclosure as follows:

| | |
|---|---|
| **Enclosure, Temporary** | The condition in which the permanent exterior walls and roofs are in place, insulated and weathertight, and windows and entrances are provided with suitable temporary enclosures. |
| **Enclosure, Permanent** | The condition in which the permanent exterior walls and |

No. 16AP-643

> roofs are in place, insulated and weathertight, and permanent windows and entrances are in place.

(Emphasis sic.) (Joint Ex. C at 5.) Almost immediately after the project began, different milestone dates were adopted in a baseline schedule. (Pl.'s Ex. 51 at 44.)

{¶ 6} Multiple witnesses testified at trial that enclosure is important to electrical work because electrical equipment can be unsafe and will deteriorate if exposed to the elements; workers (who must use fine motor control) work more slowly when cold; elevated work is dangerous when floors are icy and certain electrical components cannot be installed until the building is warm and dry with a certain degree of interior finishes in place. (Tr. Vol. 1 at 178-79, 183-84, 189-90, 199, 214-15, 220-21; Tr. Vol. 2 at 286-88, 332, 414-15, 500-01; Tr. Vol. 3 at 542-43.) When working under a school project hard deadline (when students arrive), delays in enclosure leave less time for post-enclosure contractors to do their work, resulting in overtime and higher staffing expenses ("acceleration") and multiple contractors working simultaneously in the same spaces ("trade stacking"). (Tr. Vol. 1 at 193-94, 235-38, 249-50; Tr. Vol. 2 at 472, 500-02; Tr. Vol. 3 at 541-42.)

{¶ 7} CT Taylor did not complete building enclosure by the milestone dates of either the bidding package or the revised baseline schedule. For example, Area B of the building was vital to electrical work as it contained the stage (with all associated lighting and audio/visual equipment), the cafeteria (with kitchen), the main electrical room and the teledata room. (Tr. Vol. 1 at 143-47, 283; Pl.'s Ex. 403.) Area B was scheduled to be temporarily enclosed no later than October 25, 2013 according to the bid and by December 13, 2013 by the baseline schedule. (Pl.'s Ex. 11; Ex. 51 at 44.) The construction manager, SCG, eventually claimed that temporary enclosure occurred by December 24, 2013. (Tr. Vol. 3 at 546-47; Pl.'s Ex. 108.) But pay applications from CT Taylor approved by the OFCC show that the roof shingles were only 30 percent complete and the air barrier (exterior walls) were only 60 percent complete by that time. (Pl.'s Ex. 901 at 8.) Progress for siding and soffit were only 10 percent complete, and brick veneer was only 25 percent complete. *Id.*

{¶ 8} In addition, classroom Areas A, C, and D, also were not temporarily enclosed by the original bid or baseline schedule milestone dates. According to the

original bid specifications, classroom Areas A, C, and D were to be temporarily enclosed by November 8, December 9, and October 11, 2013, respectively and by November 14, December 13, and October 22, 2013, respectively, according to the baseline schedule. (Pl.'s Ex. 11; Ex. 51 at 44.) SCG claimed to OFCC that temporary enclosure for Area A occurred on November 14, 2013 but, as of November 30, 2013, pay reports showed 90 percent progress on shingles and 0 percent progress on veneers, siding, and soffit. (Pl.'s Ex. 901 at 9; Ex. 108.) As for Area C, which was to have been enclosed on December 9 or 13 depending on bid or schedule milestone, pay reports of January 31, 2014 showed only 50 percent progress on shingles, 90 percent on exterior framing and sheathing, 0 percent on air barrier, 10 percent on siding and soffit, and 0 percent on brick veneer. (Pl.'s Ex. 901 at 8.) SCG claimed to OFCC that Area D was temporarily enclosed on November 14, 2013, but photographs taken on January 8, 2014 showed water intrusion owing to the fact that Area C (above Area D) had not yet been temporarily enclosed. (Pl.'s Ex. 901 at 8.)

{¶ 9} The most delayed portion of the project, Area E (the gym), was to be temporarily enclosed no later than November 22, 2013 according to the bid and December 13, 2013 according to the baseline schedule. (Pl.'s Ex. 11; Ex. 51 at 44.) SCG eventually claimed that Area E was temporarily enclosed on February 13, 2014. (Pl.'s Ex. 901 at 9.) But CT Taylor's pay application on February 28, 2014 showed 0 percent progress on roofing, air barrier, brick veneer, siding, and soffits. *Id.* Testimony at trial established that the gym was not permanently enclosed until June 23, 2014; the wood floor was not installed until August 6 and the electrical work in that area was not finished until after August 24, 2014. (Tr. Vol. 3 at 560-61, 614.) According to the bid, the entire project was to have been substantially completed by July 3, 2014 and, according to the baseline milestones, by July 10, 2014. (Pl.'s Ex. 11; Ex. 51 at 44.) The project was to be finally completed under bid specifications by July 11, 2014 and under baseline specifications by July 18, 2014. *Id.*

{¶ 10} As enclosure delays became apparent, Wood forecasted impairment to its ability to work efficiently and according to plan. Wood's project manager on the Dalton project testified that productivity began being impacted in the Fall 2013 because enclosure was not occurring on schedule and that the full extent of the problem could not

be predicted at that juncture. (Tr. Vol. 2 at 249, 264-65.) Wood provided notice of the likely impact on December 20, 2013 under Article 8 of the general contract conditions. (Pl.'s Ex. 87A.) Wood's notice read in relevant part:

> The delay with obtaining temporary building enclosure will have significant consequences, such as jeopardizing the current completion date and increasing the costs for the Project. * * *
>
> * * *Wood [] finds it necessary to request an extension of time * * * to make up for the lost time that will occur if these delays are not quickly resolved. Should this extension request be ignored, rejected, or not adequately addressed, Wood will likely be forced to constructively accelerate[2] its activities and will expect additional compensation for its efforts.

*Id.* at 1.

{¶ 11} SCG responded through a project manager on December 26, 2013, by setting a meeting to agree on a recovery schedule which was to put the project back on track. (Pl.'s Ex. 90.) The next day, SCG's project manager also informed CT Taylor that CT Taylor had missed the milestone enclosure deadlines and would be held responsible for any claims asserted by other contractors impacted by the delays. (Pl.'s Ex. 91.) Michael Scaparotti, president of SCG, told the letter's author to consult him in the future before issuing such statements. (Pl.'s Ex. 93.) The letter-writer presented the excuse that an official with the OFCC had "forced the issue" so "rather than rock the boat, [he] went along with it." *Id.*

{¶ 12} On January 9, the contractors met to discuss a recovery schedule. (Def.'s Ex. F[3] at 176.) One week later, when no recovery schedule had been developed, Wood requested an additional 60 days to prepare a certified claim since no recovery schedule had yet been created and predicting the full impact caused by the delays was not yet feasible. (Pl.'s Ex. 97A.) SCG granted the request on behalf of the project team. (Pl.'s Ex. 100.)

{¶ 13} On February 27, 2014, CT Taylor and the project team signed a change order form which, among other things, adjusted the milestone dates "at no cost to [OFCC

---

[2] Accelerate, as used in this construction context, means to do more work in less time. (Tr. Vol. 3 at 572.)
[3] Also labeled, in some places, as Exhibit I.

and Dalton] or penalty to [CT Taylor]" in "full and complete satisfaction for all direct and indirect costs." (Pl.'s Ex. 118 at 1.) The same change order was presented to Wood in order to obligate Wood to meet the new schedule with no additional compensation, but Wood refused to sign and only signed the recovery schedule with a written reservation of rights. (Pl.'s Ex. 128 at 1, 5; Tr. Vol. 3 at 419-21, 503-04.) The recovery schedule did not grant the extension of the project requested by Wood. The baseline final completion date of July 18, 2014 was entirely unaltered by the recovery schedule. (Pl.'s Ex. 51 at 44; Ex. 108; Tr. Vol. 4 at 808-09.) SCG's recovery schedule falsely represented that temporary enclosure had been accomplished in Areas A and D on November 14, 2013 and in Area B on December 24, 2013. (Pl.'s Ex. 108.)

{¶ 14} At the time the recovery schedule was issued, Wood requested an additional 60 days to formally substantiate and certify its claim. In an April 2, 2014 letter, the OFCC denied Wood's requested extension. (Tr. Vol. 4 at 824-25.) On April 11, 2014, Wood formally certified a claim for $207,467.57 for projected impacts arising from the failure to have "the temporary and permanent building enclosure complete by December 20, 2013" and reserved the right to supplement the claim for further delays or based on additional information that may become available. (Pl.'s Ex. 131 at 2, 3.) Citing the confidential business nature of bid and internal cost documents, Wood did not submit with its claim copies of supporting materials but, rather, offered to make them available for inspection upon request. *Id.* at 3. The same day, a representative of the OFCC instructed SCG to notify CT Taylor of the certified claim because CT Taylor was "the responsible contractor for missing the enclosure date." (Pl.'s Ex. 132.)

{¶ 15} Five days following Wood's claim submission, the project team met. (Pl.'s Ex. 136.) In the minutes of that meeting, the following appears:

> All parties feel that the claim and the dollar figure associated with the claim are unjustified and will work in a unified fashion, within the guidelines of the General Conditions to dispute the merits of the claim.

*Id.* at 3. On May 2, 2014, SCG requested further substantiation of Wood's claim. (Pl.'s Ex. 139.) On May 16, 2014, Wood provided it. (Pl.'s Ex. 141.)

{¶ 16} On June 11, 2014, thendesign drafted a one-page letter to the OFCC in which it opined that nothing at the site suggested that Wood's work needed to be

accelerated or required additional manpower. (Pl.'s Ex. 148.) It also accused Wood of falsely certifying its claim. *Id.* On June 18, 2014, following a request from OFCC, SCG provided information to supplement thendesign's letter. In its letter, SCG stated that Areas A, B, and D were temporarily enclosed and heated on or before December 13, 2013. (Pl.'s Ex. 156 at 2.) At trial, SCG's project manager (who authored the letter) was cross-examined about this representation and he admitted to using his own looser definition of temporary enclosure rather than the contract definition. (Tr. Vol. 3 at 721-22; Tr. Vol. 4 at 766-69.) SCG in its letter to OFCC accused Wood of falsely certifying its data and advised that the claim should be denied, citing that false certification is grounds for the State to "debar the Contractor from future State contracting opportunities." (Pl.'s Ex. 156 at 3.) Relying on SCG's letter and recommendation and despite no independent assessment, OFCC denied Wood's claim. (Pl.'s Ex. 160; Tr. Vol. 4 at 827-28.)

{¶ 17} On July 9, 2014, as the project neared the original final completion date set by the bid specifications, Wood appealed the decision on its claim to the OFCC. (Pl.'s Ex. 162A.) Wood attached photographs to its appeal depicting the building without a roof in December 2013 and included a report from an expert who concluded that temporary enclosures were delayed more than three weeks while permanent enclosures were delayed more than eight weeks. *Id.* at 2, 7. At the appeal meeting on August 11, 2014, Wood provided an updated damages amount of $238,727.96. (Pl.'s Ex. 180 at 1-2.) However, as that amount had not been certified in the original claim, the OFCC declined to consider it. *Id.* at 2. On December 17, 2014, the OFCC issued a decision written by its counsel denying the claim. *Id.* at 3.

{¶ 18} Two days later, on December 19, 2014, Wood sued OFCC in the Court of Claims of Ohio. (Dec. 19, 2014 Compl.) Following discovery and the filing of motions, trial began on March 31, 2016. At trial, Wood presented evidence that included the testimony of Wood's foreman, project manager, and president to substantiate its increased labor costs experienced as a result of the delays and having to do the same work in less time in environments exposed to poor weather and under "stacked contractor" conditions. (Tr. Vol. 1 & 2 at 135-321; Vol. 2 & 3 at 468-533.) However, much of what was initially disputed about the claim no longer appeared to be in serious dispute at trial. A representative of the OFCC testified that she considered it reasonable for Wood to have

relied on the bid schedule in submitting a bid (Tr. Vol. 4 at 790.) On behalf of OFCC, she acknowledged that it would have been difficult for Wood to be more definite in its claim, since the project was not complete at the time of Wood's claim submission and did not strictly follow a recovery schedule to allow Wood to accurately predict cost overruns. (Tr. Vol. 4 at 789-90, 806.) By this time, OFCC's testimony was that Wood had a valid claim but its representative simply disputed the proper amount of it. (Tr. Vol. 4 at 834-35.)

{¶ 19} On the topic of damages, both Wood and the OFCC presented witnesses who offered and were allowed to testify as experts although not explicitly qualified on the record pursuant to Evid.R. 702. (Tr. Vol. 3 at 533-667; Tr. Vol. 4 at 970-1019.) Wood's expert, Timothy Calvey, presented a damage calculation. (Tr. Vol. 3 at 623; Pl.'s Ex. 901 at 21.) OFCC's expert, Joseph Raccuia, did not present a calculation but, instead, criticized Calvey's approach. (Tr. Vol. 4 at 1006-07.)

{¶ 20} Calvey testified that he performed a "measured mile" analysis, which is the industry-preferred method of calculating damages under such circumstances. (Tr. Vol. 3 at 584-91.) The "measured mile" is performed by calculating the productivity of the work force on the project at times when they were not impacted by whatever conditions occasioned the claim, comparing that level of productivity to times when they were impacted. (Tr. Vol. 3 at 587.)

{¶ 21} Specifically, Calvey considered June through September 2013 and June through August 2014 to be times when Wood was not impacted by conditions such as unfinished interior work, exposure to bad weather, and conflict in trying to work in the same space as other contractors. (Tr. Vol. 3 at 566-67, 571-72, 581, 595-96; Pl.'s Ex. 901 at 18.) He removed from the analysis supervisor hours (workers who are not actually directly producing constructed products) and hours accrued pursuant to approved change orders and then calculated the number of worker-hours spent per 1 percent of project completion. (Tr. Vol. 3 at 596-98; Pl.'s Ex. 901 at 18.) On average, he found that during these periods, approximately 105.5 worker-hours were spent per 1 percent of completion. (Tr. Vol. 3 at 601-02; Pl.'s Ex. 901 at 18.) By contrast, he found that during the periods when the building was open to harsh winter weather and when other workers were trying to work at the same time as Wood and in the same space, Wood expended an average of 162.3 worker-hours per 1 percent of completion. (Tr. Vol. 3 at 601-02; Pl.'s Ex. 901 at 18.)

No. 16AP-643

Because approximately 53.2 percent of the total project duration was impacted, he concluded, using the difference between the impacted and unimpacted periods, that 3,024 non-supervisor hours were added to Wood's labor cost as a result of CT Taylor's failure to timely meet project enclosure milestones. (Tr. Vol. 3 at 601-02; Pl.'s Ex. 901 at 18.)

{¶ 22} Using the journeyman labor rate and taking into account 10 percent overhead, 5 percent profit, and 2 percent bonding, Calvey calculated the dollar figure for lost productivity at $201,000. (Pl.'s Ex. 901 at 20; Tr. Vol. 3 at 614-16.) Calvey testified he considered the journeyman rate a fair rate to use in the calculation because it was the rate used in change orders, which are the normal mechanism by which additional, unexpected hours are paid. (Tr. Vol. 3 at 609-11.) He also testified that he considered it fair because, although there were apprentices and not just journeyman workers on site, he had excluded supervisor hours from the calculation. *Id.* If a blended rate for all of Wood's workers present on the job were used and supervisor hours included, he testified that the resulting total would be substantially the same. (Tr. Vol. 3 at 611.)

{¶ 23} Calvey included in his overall calculation the daily cost of equipment rental and multiplied that amount by the number of days the project ran beyond the substantial completion date of the baseline schedule. (Tr. Vol. 3 at 613-16; Pl.'s Ex. 901 at 21.) He performed the same calculation with respect to supervisor hours for work days beyond the substantial completion date of the baseline schedule. (Tr. Vol. 3 at 617-18; Pl.'s Ex. 901 at 22.) The totals for these two amounts were $849 and $17,172, respectively. (Pl.'s Ex. 901 at 21-22.)

{¶ 24} The final element of Calvey's calculation was for home office overhead using the HOOP formula. (Tr. Vol. 3 at 618-23; Pl.'s Ex. 901 at 23.) Under this formula, Calvey set overhead for the project at 8 percent of the total contract amount, then divided that by the total number of scheduled days in the project for a figure for overhead cost per day. (Tr. Vol. 3 at 618-23; Pl.'s Ex. 901 at 23.) He set the number of scheduled days in the project using the contract start date in the notice to proceed and the scheduled final completion date of the baseline schedule. (Tr. Vol. 3 at 618-23; Pl.'s Ex. 901 at 23.; Ex. 35 at 2; Ex. 51 at 44.) He multiplied the overhead cost per day by the number of days between the baseline schedule completion date and the actual final completion date. (Tr.

No. 16AP-643

Vol. 3 at 618-23; Pl.'s Ex. 901 at 23.)  Including a 2 percent bond, this figure was $35,006.  (Pl.'s Ex. 901 at 23.)

{¶ 25}  The sum of all these figures was $254,027.  (Tr. Vol. 3 at 623; Pl.'s Ex. 901 at 23.)

{¶ 26}  OFCC's expert, Raccuia, testified that he saw no evidence in the daily reports or meeting notes that Wood was reporting productivity problems during the project.  (Tr. Vol. 4 at 984-86.)  He also criticized Wood's failure to track productivity throughout the project.  *Id.*  He testified that Wood's expert, Calvey, should have counted the tasks completed as a means of determining productivity rather than relying on the contractor's schedule of values.  (Tr. Vol. 4 at 981-83.)  He additionally testified that Calvey should have considered only the same type of activities when calculating the measured mile (that is, for instance, laying conduit could only be compared to laying conduit).  (Tr. Vol. 4 at 1014-15.)

{¶ 27}  Raccuia admitted that at the time of his deposition he thought that Wood was entitled to something on its claim but changed his mind based on SCG's representations about when the project was enclosed.  (Tr. Vol. 4 at 989-90, 996-98, 1017-18.)  Although he criticized Calvey as not properly employing the measured mile approach, he admitted that his criticism was not supported by citation to any publication or industry-recognized material.  (Tr. Vol. 4 at 1002-05.)  Raccuia also testified that he was not offering an opinion on the proper calculation of Wood's damages and that if the court were to find that Wood was entitled to something, he offered no opinion on how much that would be.  (Tr. Vol. 4 at 1006-07.)

{¶ 28}  On August 12, 2016, the Court of Claims issued a judgment entry in favor of Wood in the amount of $254,027.  (Aug. 12, 2016 Decision & Jgmt. Entry at 11.)  The Court of Claims found that the OFCC had breached its contract with Wood by failing to enforce milestone deadlines against CT Taylor.  The court noted that SCG had used a definition other than the contract definition to falsely deem areas of the school building to be enclosed and that the OFCC had denied Wood's claim on such basis.  *Id.* at 8-9.  The Court of Claims found that the HOOP method was an appropriate method for calculating home office overhead.  *Id.* at 10.  The court found Raccuia's testimony unconvincing because it was based on false enclosure dates provided by SCG and presupposed that

No. 16AP-643

Wood was obligated to consistently complain about the effects of late enclosure dates on its projected productivity rather than simply file the contractually required notice and claim. *Id.* at 8, 10. The Court of Claims further stated that, even had Raccuia been credible, he had offered no opinion as to what damages were owed if the court were to conclude that damages were warranted. *Id.* at 10-11. The Court of Claims found that, though there were potentially other ways damages could have been calculated, Calvey's opinion set forth Wood's damages with a reasonable degree of certainty, and without a competing opinion, the court would not speculate on other potential measures of damages. *Id.* at 11.

{¶ 29} The OFCC now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 30} The OFCC's brief does not contain assignments of error or a statement of issues presented for review as required by Ohio Appellate Rule 16(A)(3) and (4). Under Loc.R. 10(D) of the Tenth District Court of Appeals, failure to file assignments of error is cause to dismiss an appeal unless the appellant demonstrates that neither undue delay nor prejudice was caused by the failure to comply with the rules. However, as appellee has not raised the issue, we elect, in our discretion, to treat the OFCC's argument section headings as assignments of error. But we note that a potentially independent ground for the denial of appellate relief to the OFCC could be its failure to set forth assignments of error.

{¶ 31} The OFCC's section headings read as follows:

[1.] THE TRIAL COURT'S DECISION IS CONTRARY TO THE SUPREME COURT'S PRECEDENT IN *COMPLETE GENERAL*

[2.] THE TRIAL COURT IMPERMISSIBLY AWARDED APPELLEE-CONTRACTOR DAMAGES THAT EXCEEDED THEIR STATUTORILY CERTIFIED AMOUNT

[3.] THE TRIAL COURT IMPERMISSIBLY SHIFTED THE BURDEN OF PROOF

No. 16AP-643

(Nov. 14, 2016 OFCC Brief at i.)[4]

## III.  DISCUSSION

### A. Whether the Trial Court's Decision was Contrary to *Complete Gen. Constr. Co. v. Ohio Dept. of Transp.*, 94 Ohio St.3d 54 (2002)

{¶ 32} In *Complete Gen. Constr. Co. v. Ohio Dept. of Transp.*, 94 Ohio St.3d 54 (2002), the Supreme Court of Ohio considered when compensation for home office overhead is available under the *Eichleay* formula.[5]  That formula is:

> 1.  (Total billings for the contract at issue/Total billings from all contracts during the original contract period) x (Total overhead during the original contract period) = Overhead Allocable to the Contract.
>
> 2.  (Overhead Allocable to the Contract)/(Original planned length of the contract in days) = Daily Contract Overhead Rate.
>
> 3.  (Daily Contract Overhead Rate) x (Compensable period in days) = Unabsorbed Overhead Damages.

*Complete Gen.* at 58, citing *West v. All State Boiler, Inc.*, 146 F.3d 1368, 1379, fn. 4 (Fed.Cir.1998).

{¶ 33} The Supreme Court also set forth two prima facie elements that must be proved before the *Eichleay* formula may be applied in awarding damages:

> Before the *Eichleay* formula may be applied, the contractor must demonstrate two important elements in order to establish a prima facie case for the award of damages. First, the contractor must demonstrate that it was on "standby." *Interstate Gen. Govt. Contractors*, 12 F.3d at 1056. A contractor is on standby "when work on a project is suspended for a period of uncertain duration and the contractor can at any time be required to return to work immediately." *All State Boiler*, 146 F.3d at 1373. In effect, the contractor is not working on the project, yet remains bound to the project. The contractor must be ready to immediately resume performance at any time.

---

[4] In its reply brief, the OFCC sets forth three somewhat similar but not identical argument headings. (OFCC Reply Brief at i.)

[5] This formula originates in *Eichleay Corp.*, ASBCA No. 5183, 60-2 B.C.A. (CCH) ¶ 2688.

No. 16AP-643

> The second element in a prima facie case is that the contractor must prove that it was unable to take on other work while on standby. *Id.* That is, the contractor must show that the uncertainty of the duration of the delay made it unable to commit to replacement work on another project. Impracticability, rather than impossibility, of other work is the standard, and the contractor is entitled to damages " 'only if its inability to take on additional work results from its standby status, *i.e.,* is attributable to the government.' " (Emphasis sic) *Id.*, 146 F.3d at 1375, quoting *Satellite Elec. Co.*, 105 F.3d at 1421.

Complete Gen. at 58-59.

{¶ 34} Wood has never sought to use the *Eichleay* formula to compute its home office overhead in this case. Rather, Wood relies on the HOOP formula as adopted by the Ohio Department of Transportation ("ODOT"). And nothing in the contract terms forbids Wood from using the HOOP formula or requires Wood to use the *Eichleay* formula in computing home office overhead for purposes of a claim. (Joint Ex. B.) Nonetheless, the OFCC argues that we should reverse the trial court's decision for failing to require proof by Wood on the two elements set forth in *Complete General.* (OFCC Brief at 8-12.) Although the method of calculation employed by Calvey essentially used steps 2 and 3 of the *Eichleay* formula and thus was similar to the *Eichleay* formula, it was not identical to it. (Tr. Vol. 3 at 618-23; Pl.'s Ex. 901 at 23.) As such, this case does not exactly mirror the fact pattern of *Complete General.*

{¶ 35} This case does, however, mirror the fact pattern of *J&H Reinforcing & Structural Erectors, Inc. v. Ohio School Facilities Comm.*, 10th Dist. No. 12AP-588, 2013-Ohio-3827, ¶ 100-06, in which J&H (also using Calvey as an expert) sought to recover home office overhead using the same HOOP ODOT method; in that case, the Ohio School Facilities Commission[6] ("OSFC") also argued that *Complete General* controlled the result. In *J&H*, this Court reasoned:

> OSFC contends that J&H is not entitled to any damages for home office overhead. OSFC insists that home office overhead may only be calculated using the *Eichleay* formula. The *Eichleay* formula is an equation employed by federal courts in calculating home office overhead attributable to owner-caused

---

[6] The OSFC is apparently the predecessor entity to the OFCC.

delay. *Complete Gen. Constr.* at 57. However, an owner-caused delay in construction does not necessarily lead to an award of damages for home office overhead:

> Before the *Eichleay* formula may be applied, the contractor must demonstrate two important elements in order to establish a prima facie case for the award of damages. First, the contractor must demonstrate that it was on "standby." * * *

> The second element in a prima facie case is that the contractor must prove that it was unable to take on other work while on standby. * * *

(Internal citations omitted.) (Emphasis sic.) *Id.* at 58-59.

The Supreme Court continued:

> The *Eichleay* formula goes nowhere without causation. A contractor may recover only if there is an *owner-caused* construction delay. Moreover, the "standby" character of the delay must also be caused by the owner, and must prevent the contractor from finding replacement projects to cover the overhead.

(Emphasis sic.) *Id.* at 60.

OSFC contends that J&H is not entitled to damages under the *Eichleay* formula because J&H failed to establish a prima facie case for such an award. More particularly, OSFC argues that J&H's evidence established that its work was never suspended and that it was never unable to bid on other projects. OSFC further contends that J&H could not recover under the *Eichleay* formula because the post-CO 29 delays were caused by other prime contractors, not OSFC.

OSFC's contentions regarding the *Eichleay* formula are unavailing, as use of the *Eichleay* formula is discretionary. In *Complete Gen. Constr.*, the court expressly stated, "[w]e do not find that the *Eichleay* formula is the exclusive manner of determining unabsorbed home office overhead." *Id.* at 55. Indeed, the court held in the syllabus that "[t]he *Eichleay* formula, modified for use in Ohio courts, is one way of determining unabsorbed home office overhead damages in public construction delay cases." (Emphasis added.) *Id.* at syllabus. Pursuant to *Complete Gen. Constr.*, the referee acted within its discretion in applying a formula other than the

No. 16AP-643

> *Eichleay* formula in calculating home office overhead damages.

(Emphasis sic.) *J&H* at ¶ 103-06.

{¶ 36} This Court has previously concluded that the two elements of prima facie proof discussed in *Complete Gen.* are applicable to the *Eichleay* formula and not necessarily to other formulas (like HOOP) for calculating home office overhead. *J&H* is a recent case and for reasons of stare decisis, we adhere to that decision. Accordingly, we conclude that the trial court did not err in failing to require proof of the *Complete Gen.* factors before considering the HOOP calculation.

## B. Whether the Trial Court Erred in Awarding Wood Damages That Exceeded the Amount Wood Certified in Their Article 8 Claim

{¶ 37} The OFCC argues that Wood was forbidden from asserting higher damages in its action in the Court of Claims than Wood asserted when it certified its claim for resolution during the course of construction. (OFCC Brief at 12-19.) To support this proposition, the OFCC relies on R.C. 153.12(B) and cases stating that, as a matter of statute, a contractor in a public contract with the State must exhaust contractual remedies before pursuing a suit in the Court of Claims. (OFCC Brief at 13-16.) The OFCC does not argue that Wood failed to exhaust the contract remedies in respect to its original claim. It rather argues that Wood should not have asserted an amount beyond or different from its original certified claim when it sued in the Court of Claims. (OFCC Brief at 12-19.) The OFCC has not cited a statute, case, or rule in support of its argument and we find no case law to support such a position.

{¶ 38} Though the OFCC implies that some bad-faith after-construction inflation of the claim occurred, we find this assertion to be inconsistent with the evidence in the record. Wood first gave notice of the claim on December 20, 2013, soon after CT Taylor missed the baseline schedule enclosure milestones for Areas B, C, and E. (Pl.'s Ex. 87A.) It certified the claim on April 11, 2014. (Pl.'s Ex. 131.) It supplemented the claim on May 16, 2014. (Pl.'s Ex. 141.) It updated damages at a commission hearing on August 11, 2014. (Pl.'s Ex. 180 at 1-2.) According to the pay schedules and construction manager documents, construction was not actually substantially completed until August 24, 2014 and not finished completely until October 6, 2014. (Tr. Vol. 3 at 614, 621, 626.) Calculating HOOP, for example, requires knowledge (or an accurate estimate) of the

No. 16AP-643

length of the project overrun. The OFCC does not explain how Wood was supposed to have performed that calculation before the termination of the project given that not one of the schedules produced in the course of this project was even substantially followed by CT Taylor.

{¶ 39} The OFCC's argument is also not consonant with the procedural history of the claim. After timely notifying the OFCC of its claim under the terms of the contract, Wood twice requested extensions of the certification deadline in order to appropriately take account of the full impact of the ongoing delays caused by CT Taylor's failure to meet the enclosure milestones. (Pl.'s Exs. 87A, 97A, 100; Tr. Vol. 4 at 824-25.) The first such request was granted. (Pl.'s Exs. 97A, 100.) However, the OFCC denied the second and thereby forced Wood to submit a certified claim when the extent of its damages was still in question. (Tr. Vol. 4 at 824-25.) It would have been inequitable for the trial court to have restricted Wood to its certified claim when OFCC forced Wood to submit its claim before being able to take the full measure of their damages.

{¶ 40} Finally, OFCC's interpretation of the contract would create a manifest absurdity for a claimant. That is, because Wood submitted timely notice and was denied extensions to certify, it could not accurately predict its full damages at the time it was required to certify. Thus, OFCC now argues that Wood should be limited to its estimation of damages set forth in the certified claim. But conversely, had Wood delayed in submitting a notice until after it became aware of the full extent of its damages to ensure that its certified claim was timely and complete, that notice would have been untimely and OFCC would doubtless argue that the claim should then have been denied on that basis. (Joint Ex. B at 44.) Thus, according to OFCC's view of the contract, there is no scenario under which Wood could have been compensated for its full damages. This interpretation is a manifest absurdity and, for that reason, is to be avoided. *See Laboy v. Grange Indem. Ins. Co.*, 144 Ohio St.3d 234, 2015-Ohio-3308, ¶ 8.

{¶ 41} The trial court did not err in failing to limit Wood to the damages set forth in its original certified claim.

### C. Whether the Trial Court Shifted the Burden of Proof from Wood to the OFCC

{¶ 42} The OFCC argues that the Court of Claims in its decision improperly shifted the burden of establishing damages from Wood to OFCC. However, the court merely

No. 16AP-643

noted the OFCC's strategy had been to criticize Calvey's methods, not to offer an alternative. (Aug. 12, 2016 Decision & Jgmt. Entry at 10-11.) The Court of Claims did not find the testimony of OFCC's expert to be credible. *Id.* Instead, it concluded that Calvey, Wood's expert, had "set[] forth Wood Electric's damages within a reasonable degree of certainty," and there were no further arguments or measures of damages to address. *Id.* at 11.

{¶ 43} Specifically, the Court said:

> OFCC asserts that while ODOT recognizes the HOOP method for determining home office overhead, OFCC does not recognize the method and sought to have the Court reject the method. OFCC offered no alternative calculation. The Court realizes that every department of the State of Ohio has the authority to set its own rules for enforcing their own contracts. In this case, OFCC has not established their own method for determining home office overhead so the Court believes that a reasonable method for determining the HOOP figure is the figure recognized by ODOT. Furthermore, OFCC's expert's opinion was somewhat discounted by the Court because he relied upon completion dates given to him by [SCG's project manager], which all parties know were false.

> The Court also notes that while it has accepted Calvey's measured mile and HOOP calculations as proper for this case, the measured mile and HOOP analyses may not be appropriate methods to calculate damages in other situations. The Court must consider the facts of each case and the methodology used in determining whether those methods should be applied. In this case, the only opinion given to this Court regarding the overall damages incurred by Wood Electric was the expert opinion of Calvey. While OFCC's expert testified that in his opinion, Calvey's figures were flawed, he offered no alternative opinion. The Court is aware that its responsibility as the fact finder is to weigh all of the evidence and reach an independent decision on the amount of damages proximately caused by OFCC's breach. In doing so, the Court cannot speculate.

> "[T]he extent of damages suffered by a plaintiff is a factual issue, it is within the jury's [or fact finder's] province to determine the amount of damages to be awarded." *Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 475, 2007-Ohio-6948, 880 N.E.2d 420 (2007). "Where a right to damages has been established, such right will not be denied merely because a party cannot demonstrate with mathematical certainty the

No. 16AP-643

> amount of damages due." *Tri-State Asphalt Corp. v. Ohio Dept. of Transp.*, 10th Dist. Franklin No. 94API07-986, 1995 Ohio App. LEXIS 1554 (Apr. 11, 1995), citing *Geygan v. Queen City Grain Co.*, 71 Ohio App.3d 185, 195, 593 N.E.2d 328 (12th Dist.1991). Furthermore, "a party seeking damages for breach of contract must present sufficient evidence to show entitlement to damages in an amount which can be ascertained with reasonable certainty. *Id.* at 14.
>
> The Court has applied the proper standards and has determined that the expert opinion rendered by Calvey sets forth Wood Electric's damages within a reasonable degree of certainty. Although, the comparisons used for impacted and non-impacted periods in the measured mile calculations may not be identical, the Court finds that Calvey reasonably calculated damages with the data available to him. Accordingly, judgment shall be rendered in favor of Wood Electric in the amount of $254,027.00.

(Aug. 12, 2016 Decision & Jgmt. Entry at 10-11.)

{¶ 44} We do not discern burden-shifting in this reasoning; instead, we see merely an observation by the trial court that having failed in the gambit to discredit Calvey's analysis, the OFCC offered no other testimony-based calculation for the trial court to consider in the alternative. The Court of Claims' finding that Wood had proved its case but that OFCC had not presented reason to doubt Wood's proof was not burden shifting to OFCC to prove a lack of liability. The trial court did not err.

## IV. CONCLUSION

{¶ 45} Based on our prior precedent and stare decisis we conclude that *Complete General* does not apply in this case because Wood sought to employ the HOOP formula rather than the *Eichleay* formula. There exists neither a precedential nor persuasive circumstantial basis for constraining the monetary amount of Wood's suit in the Court of Claims to match the amount asserted in its Article 8 contract claim. When the Court of Claims found that Wood had proved its case and offered a reasonable computation of damages, its finding did not result in burden-shifting when it observed that the OFCC had not offered evidence of an alternative damages calculation. The OFCC offered no assignments of error and its arguments are unavailing. Accordingly, we affirm the judgment of the Court of Claims of Ohio.

No. 16AP-643

*Judgment affirmed.*

**KLATT and DORRIAN, JJ., concur.**

---