[Cite as *Jindal Builders & Restoration Corp. v. Cincinnati Metro. Hous. Auth.*, 2020-Ohio-4043.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| JINDAL BUILDERS & RESTORATION CORP., | : | APPEAL NO. C-190217 |
| | | TRIAL NO. A-1704087 |
| | : | |
| Plaintiff-Appellant, | | |
| | : | *O P I N I O N.* |
| vs. | | |
| | : | |
| CINCINNATI METROPOLITAN HOUSING AUTHORITY, | : | |
| | | |
| Defendant-Appellee. | : | |

Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: August 12, 2020

*Lindhorst & Dreidame Co., LPA, Barry F. Fagel* and *Elizabeth M. Mahon,* for Plaintiff-Appellant,

*Adams, Stepner, Woltermann & Dusing, PLLC,* and *Jeffrey C. Mando,* for Defendant-Appellee.

**BERGERON, Judge.**

{¶1} Delays in construction projects are one of the banes of existence. In this case, a contractor and owner fence over who bears the risk of loss for delay, and whether overhead costs are recoverable as damages under the contract at hand. Although the trial court denied the contractor any relief, we conclude that it erred by prohibiting overhead damages, but that only part of the time period sought by the contractor is ultimately recoverable. We therefore reverse in part and remand for further proceedings.

I.

{¶2} To fully appreciate the dispute in this case, we begin with an overview of the Millvale North Development Project in Cincinnati. Originally, in 2014, defendant-appellee Cincinnati Metropolitan Housing Authority ("CMHA") undertook a rehabilitation project for several public housing buildings in its Millvale North development, awarding the entirety of this project to a third-party contractor. However, the original contractor proved not up to the task and could not finish the entire project, prompting CMHA to divide the contract into two phases—leaving the original contractor on Phase I, but searching for another contractor to complete Phase II. According to CMHA, it planned to transfer Phase II residents into the Phase I units upon its completion, thereby vacating the Phase II units for rehabilitation. But, unfortunately for CMHA, even after the division, the original contractor continued to struggle, leading CMHA to conclude that if you want something done right, do it yourself, and thus it terminated that contractor and deemed itself the general contractor of Phase I. In the meantime, CMHA hunted for a contractor for Phase II, ultimately landing on plaintiff-appellant Jindal Builders & Restoration, Corp., ("Jindal") in December 2015.

{¶3} Two months later, in February 2016, Jindal and CMHA entered into a contract for "construction and comprehensive modernization services at CMHA's Millvale

2

North Development – Phase II, Buildings[.]" Within this contract, CMHA delineated the various aspects of Jindal's obligations, including job responsibilities, payment, and the period of performance, requiring Jindal to complete the project within 365 days from the date established in the notice to proceed. Notably, nowhere within the contract did CMHA condition Jindal's start date on Phase II to the completion of Phase I units or mandate Phase II residents relocate to Phase I units.

{¶4} The contract also incorporated several of the federal trappings ordinary to a government construction contract, including the Housing and Urban Development ("HUD") general conditions for construction contracts awarded by public housing agencies. Relevant to this appeal, section 30 of the general conditions allows a contractor to recover damages for delays caused solely by the government-contracting officer—this section punctuated with caveats addressed in more depth below. As will become apparent, this section assumes significance since, after the parties signed the contract, a series of delays occurred resulting in Jindal not starting work until months after the anticipated start date.

{¶5} In April 2016, just two months after signing the contract, CMHA issued a notice to proceed, advising Jindal to begin work on April 18, 2016, and fixing the completion date as July 26, 2017. But Jindal did not arrive at the Phase II work site, equipment in hand, on April 18, and CMHA contends that both parties understood July 26 to be the true start date. Consequently, April 18 came and went, with CMHA continuing to labor away on Phase I until July 9 when CMHA discovered significant vandalism at those units. According to CMHA, this threw a wrench in its plan, leaving the residents in Phase II unable to decamp to Phase I until CMHA repaired and completed the Phase I units.

{¶6} As July 26 approached, Jindal's project manager, Jeff Reams, reached out to CMHA's construction contract supervisor, Ronald Veley, on July 20 inquiring about the

3

relocation of the Phase II residents. Mr. Veley optimistically, yet vaguely, responded that he hoped to complete the other two buildings in Phase I by the next week, but failed to provide an anticipated start date for Phase II. A few weeks elapsed, with Jindal still awaiting the relocation of the Phase II residents and unable to begin its work. Growing ever more concerned, Mr. Reams reached out again to CMHA, underscoring the urgency: "We bid this project in early December 2015 with an anticipated spring 2016 start time and based our bid numbers on that time frame. As of today August 16, 2016 we are still waiting on a start date * * * causing time delays and extra cost to complete this project * * *. Please give us an update on when we can expect to start this project so we can plan accordingly." Reinforcing this concern, Mr. Reams followed up on August 17 and 18, pleading with CMHA to provide a start date, but to no avail—CMHA ignored these outreaches.

{¶7}    Nearly a month passed before Mr. Reams and Anil Jindal, president of Jindal, both simultaneously reached out to CMHA on September 12, begging for direction on when the Phase II units would be vacated so Jindal could begin its work and emphasizing the ramifications of this delay on Jindal's billings and bond program. Again, based on the record before us, CMHA offered nothing but silence as to the project's status. Finally, on October 17, CMHA informed Jindal that it vacated all Phase II units and Jindal therefore could commence work. However, because Jindal had yet to acquire necessary permits for the work, Jindal did not begin its work until November 10 (or November 17, a date later claimed by Jindal).

{¶8}    With the Phase II project finally underway, Jindal submitted various change orders. The first of these arrived on December 2, 2016, with Jindal seeking an adjustment for additional costs for the upcoming winter months (i.e., December, January, and February) incurred because of the delay to the start of the project, which CMHA in turn

4

denied.  Jindal accordingly revised and resubmitted another change order on April 11, 2017, this time pursuing, under section 30 of the contract, overhead damages suffered during the delay between April and November 2016.  A few weeks later, on April 29, Jindal revised the change order one last time, seeking damages for the same time period in different amounts, but this achieved the same result—CMHA denied both requests.  In the wake of CMHA's denials, Jindal filed suit against CMHA, alleging breach of contract and seeking recovery for overhead damages incurred for the delay between April and November 2016.  Despite the pending lawsuit, Jindal ultimately completed the rehabilitation of the Phase II units and performed the contract in full.

{¶9}    At the two-day bench trial, Jindal's breach-of-contract claim against CMHA centered upon section 30 of the contract, i.e., the suspension of work clause:

(b) If the performance of all or any part of the work is, for an unreasonable period of time * * * delayed * * * (1) by an act of the Contracting Officer in the administration of this contract, or (2) by the Contracting Officer's failure to act within the time specified (or within a reasonable time if not specified) in this contract an adjustment shall be made for any increase in the cost of performance of the contract (excluding profit) necessarily caused by such unreasonable * * * delay * * * and the contract modified in writing accordingly. However, no adjustment shall be made under this clause for any * * * delay * * * to the extent that performance would have been so * * * delayed * * * by any other cause[.]

(c) A claim under this clause shall not be allowed (1) for any costs incurred more than 20 days before the Contractor shall have notified the Contracting Officer in writing of the act or failure to act involved * * * and (2) unless the

5

claim, in an amount stated, is asserted in writing as soon as practicable after the termination of the * * * delay * * * but not later than the date of final payment under the contract.

No one really disputes that a delay occurred here—the question more is who bears responsibility. According to Jindal, CMHA solely caused the delay between April and November 2016, and thus, because Jindal provided CMHA with the requisite notice, CMHA's unreasonable delay entitled Jindal to overhead damages incurred while it awaited the start of work on Phase II.

{¶10} To support its case, Jindal presented testimony from Mr. Reams and Mr. Jindal, detailing the reasons for and consequences of the delay. This permitted, according to Jindal, recovery of overhead damages nearing $300,000, with a CPA testifying to the appropriateness of this amount. To rebut this evidence, CMHA's construction contract supervisor, Mr. Veley, and director of real estate and construction, Joseph Norton, insisted that CMHA notified Jindal at the signing of the notice to proceed that, contrary to the date on the notice, the start date would actually be July 26. Further, CMHA shifted blame, asserting Jindal's failure to obtain the necessary permits, the vandalism to Phase I, and the delay in completion of Phase I instead occasioned the seven-month delay.

{¶11} Upon considering both parties' evidence, the trial court ultimately sided with CMHA, finding in favor of CMHA and entering judgment for it. Specifically, the court found that Jindal could not recover because (1) section 30(b) does not permit recovery of general overhead damages, (2) the cause of delay was not CMHA, but instead relocation issues and vandalism, as well as Jindal's failure to obtain the necessary permits—the court deeming all this events outside of CMHA's control—and (3) Jindal failed to deliver the appropriate notice in compliance with section 30(c). Jindal now appeals, challenging in a single

assignment of error all these findings and conclusions. Accordingly, we address each of these challenges in turn.

II.

{¶12} On appeal, Jindal challenges the trial court's interpretation of the contract and its findings of fact, each necessitating its own standard of review. *See MRI Software, L.L.C. v. West Oaks Mall FL, L.L.C.*, 2018-Ohio-2190, 116 N.E.3d 694, ¶ 10 (8th Dist.) ("Appellate review of a mixed question of fact and law requires an appellate court to give deference to a trial court's factual findings if they are supported by competent, credible evidence, and to independently review whether the trial court properly applied the law to the facts."). As to Jindal's assertions that the court erred in its interpretation of section 30, this constitutes a matter of law, which we review de novo. *See Ignazio v. Clear Channel Broadcasting, Inc.*, 113 Ohio St.3d 276, 2007-Ohio-1947, 865 N.E.2d 18, ¶ 19 ("But the interpretation of a contract is a matter of law that we review de novo."); *Western and Southern Life Ins. Co. v. Bank of New York Mellon*, 2019-Ohio-388, 129 N.E.3d 1085, ¶ 6 (1st Dist.) ("This court reviews the interpretation of a contract de novo.").

{¶13} But as to Jindal's challenges to the court's factual findings, we instead "presume that the findings of the trier of fact are correct," given the court's opportunity to view the witnesses and observe their demeanor. *Lehigh Gas-Ohio L.L.C. v. Cincy Oil Queen City, L.L.C.*, 1st Dist. Hamilton No. C-130127, 2014-Ohio-2799, ¶ 44; *see Tidewater Fin. Co. v. Cowns*, 197 Ohio App.3d 548, 2011-Ohio-6720, 968 N.E.2d 59, ¶ 11 (1st Dist.), quoting *Lucero v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 11AP-288, 2011-Ohio-6388, ¶ 16, quoting *Seasons Coal Co., Inc. v. City of Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984) (" 'In an appeal from a bench trial, a reviewing court must presume that the factual findings of the trial judge are correct because the trial judge had an opportunity "to

view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." ' "). Accordingly, we afford due deference to the court as the finder of fact, evaluating whether "some competent and credible evidence" supports the court's findings. *MRI Software* at ¶ 12 ("A reviewing court must, therefore, accord due deference to the credibility determinations made by the fact finder."); *see Roark v. Rydell*, 174 Ohio App.3d 186, 2007-Ohio-6873, 881 N.E.2d 333, ¶ 54 (1st Dist.) ("Our review of the trial court's factual determinations is highly deferential.").

III.

A.

{¶14} We begin with Jindal's assertion that the court improperly interpreted section 30 to prohibit recovery of general overhead costs, which we review de novo. *See Ignazio* at ¶ 19. Jindal contends that section 30(b) entitles it to recover damages in the form of overhead costs arising out of the delay that increased the overall cost of performance, not just actual work done, as the trial court found.

{¶15} As in any contractual dispute, our "primary objective is to ascertain and give effect to the parties' intent," searching the language the parties selected for clues. *Wal-Mart Realty Co. v. Tri-County Commons Assocs., LLC*, 1st Dist. Hamilton No. C-160747, 2017-Ohio-9280, ¶ 10. And the parties here elected to incorporate HUD's general conditions for construction contracts, i.e., form HUD-5370, section 30 that we quoted above.

{¶16} Specifically, section 30(b) permits a contractor to recover for "any increase in the cost of performance of the contract (excluding profit)," if the contractor's performance of all or any part of the work is, for an unreasonable period of time, delayed by the contracting officer's act or failure to act. Stated differently, if a contractor incurs increased

8

costs by virtue of an act or failure to act by the contracting officer that effectively delays the contractor's ability to perform the contract, then section 30 permits recovery of those additional costs. *See George Sollitt Const. Co. v. United States*, 64 Fed.Cl. 229, 236-237 (2005) (finding that "[i]f the contractor suffers increased costs because of government action or inaction which effectively suspends the contractor's progress on contract work, [the suspension of work] clause may provide a remedy."). Notably, section 30(b) explicitly excludes "profit" from its scope, barring a contractor from recuperating lost profit arising out of the contracting-officer-caused delay. *See Maki v. United States*, 13 Cl.Ct. 779, 783 (1987) (interpreting an identical suspension of work clause to "expressly exclude[] claims for lost 'profit.' "). Consequently, under section 30, a contractor may seek recovery for additional costs to its performance directly stemming from the contracting-officer-caused delay, as long as that additional cost is not profit.

{¶17} And this makes sense, as it is well-established that when performing a contract, a contractor incurs not only direct costs, but also indirect costs. *See Complete Gen. Constr. Co. v. Ohio Dept. of Transp.*, 94 Ohio St.3d 54, 57, 760 N.E.2d 364 (2002) (explaining "construction projects incorporate two different kinds of costs," specifically direct and indirect costs). As to the former, direct costs include expenses "directly attributable to the performance of a specific contract"—i.e., equipment expenses, construction wages, etc. *Nicon, Inc. v. United States*, 331 F.3d 878, 882 (Fed.Cir.2003); *see Complete Gen.* at 57. By contrast, indirect costs consist of expenses generally involved in running a business, and thereby not attributable to any one project—overhead expenses the most significant indirect cost among them. *See J & H Reinforcing & Structural Erectors, Inc. v. Ohio School Facilities Comm.*, 10th Dist. Franklin No. 12AP-588, 2013-Ohio-3827, ¶ 100, citing *Complete Gen.* at 57; *Altmayer v. Johnson*, 79 F.3d 1129, 1132 (Fed.Cir.1996)

("Home office overhead costs are those that are expended for the benefit of the whole business, which by their nature cannot be attributed or charged to any particular contract."). Because overhead costs include expenses such as salaries of executive or administrative personnel, general insurance, rent, interest on loans, etc., contractors generally spread overhead costs "proportionally across ongoing projects." *City of Cincinnati v. Triton Servs., Inc.*, 2019-Ohio-3108, 140 N.E.3d 1249, ¶ 53 (1st Dist.); *see Charles G. Williams Const., Inc. v. White*, 271 F.3d 1055, 1058 (Fed.Cir.2001), quoting *West v. All State Boiler, Inc.*, 146 F.3d 1368, 1372 (Fed.Cir.1998) (" 'A contractor recovers its indirect costs by allocating them on a proportionate basis among all of its contracts."). Consequently, "[w]hen a delay occurs on a particular construction project, that particular project ceases to carry its weight in regard to running the business, which can result in damages to the contractor." *Complete Gen.* at 57. In other words, a delay can render the contractor's overhead costs unabsorbed, with the billings for that project failing to cover its apportioned amount. *See Triton Servs.* at ¶ 53 ("When an owner-caused delay substantially diminishes a project's cash flow, the contractor's fixed overhead costs are not absorbed by the delayed project[.]"); *Nicon* at 882, quoting *C.B.C. Ents., Inc. v. United States*, 978 F.2d 669, 671 (Fed.Cir.1992) ("[W]hen the government causes a delay or suspension of performance, this 'decreases the stream of direct costs against which to assess a percentage rate for reimbursement.' ").

{¶18} Contemplating this problem, both Ohio and federal courts generally permit contractors to recover general overhead costs arising out of a government-caused delay. *See All State Boiler* at 1370 (interpreting an identical suspension of work clause to allow the contractor to recover unabsorbed overhead costs resulting from the government-caused delay); *Complete Gen.* at 57 (discerning the appropriate formula to apply when calculating damages for overhead costs incurred but unabsorbed due to the government-caused delay);

10

*Wood Elec., Inc. v. Ohio Facilities Constr. Comm.*, 2017-Ohio-2743, 90 N.E.3d 371, ¶ 36 (10th Dist.) (affirming the court's application of the HOOP formula to calculate the contractor's home office overhead damages arising out of the government-caused delay); *Stockton E. Water Dist. v. United States*, 109 Fed.Cl. 760, 799 (2013) ("Courts also have awarded damages for overhead expenses when the Government imposed a delay or suspension of the contract work and thereby interrupted or reduced the contractor's stream of income.").

**{¶19}** With this backdrop in mind, we turn to the contract at hand, observing no prohibition in section 30 for recovery of overhead damages. In fact, the plain language bars only one type of damages from its purview, specifically "profit." Given the ubiquity of overhead costs in the construction industry and the well-chronicled case law on this point, it seems more than reasonable to conclude that if the parties intended to limit recovery of overhead costs, the language would reflect as much. *See Dellagnese Const. Co. v. Nicholas*, 9th Dist. Summit No. 22951, 2006-Ohio-4350, ¶ 12 ("By expressing these specific limitations on appellee's recovery, the parties impliedly excluded other limitations.").

**{¶20}** Bolstering this point, other provisions within the contract contemplate such distinctions between direct costs, indirect costs, and profit. For instance, section 29, governing change orders, similarly permits equitable adjustments to the contract, delineating the expenses within its purview: "The Contractor's written proposal for equitable adjustment shall be submitted in the form of a lump sum proposal supported with an itemized breakdown of all increases and decreases in the contract in at least the following details: (1) Direct Costs * * * (2) Indirect Costs * * * (3) Profit[.]" In light of section 29, we conclude that the parties certainly appreciated the distinctions between recoverable expenses, and therefore intended to exclude only "profit," not indirect costs (such as

11

overhead), from section 30's scope. Accordingly, we read section 30 to allow recovery of overhead damages, as long as the contractor meets the additional requirements nestled in the suspension of work clause (i.e., causation and timely notice). We thus find that the trial court erred in interpreting section 30 to the contrary.

B.

{¶21} Although overhead damages are indeed recoverable under section 30, Jindal's journey is not yet complete, with section 30 necessitating that it clear two more hurdles before recovering—causation and timely notice. Regarding causation, section 30 does not permit a contractor to obtain overhead damages for just any delay, but specifically one that the contracting officer solely caused. Consequently, because Jindal seeks overhead damages stemming from a series of delays between April and November 2016, each delay must necessarily arise out of the action or inaction of CMHA. Underscoring that point, section 30(b) explains, "[h]owever, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor[.]" Based on the plain language of section 30(b), a contractor may only recover for costs under this provision if the contracting officer is the sole cause of the delay—with concurrent delay occasioned by the negligence or fault of the contractor or another barring relief. *See MW Builders, Inc. v. United States*, 134 Fed.Cl. 469, 508 (2017), quoting (Emphasis sic.) *Triax-Pacific v. Stone*, 958 F.2d 351, 354 (Fed.Cir.1992) (reasoning an identical suspension of work clause requires the contracting officer be " 'the *sole* proximate cause of the contractor's additional loss, and the contractor would not have been delayed for *any other reason* during that period.' "). Consequently, "even if the government has caused an unreasonable delay to contract work, that delay will not be compensable if the

12

contractor, or some other factor not chargeable to the government, has caused a delay concurrent with the government-caused delay." *George Sollitt Const. Co.*, 64 Fed.Cl. at 238; *see MW Builders* at 508 ("[T]he contractor may not recover, if there is a concurrent delay caused by the contractor or some other third party.").

{¶22} Here, the trial court concluded that section 30 "only allows for recovery of delay damages which are directly caused by CMHA[.]" Applying this provision of the contract, the court then attributed the delay to "vandalism and relocation issues and Jindal's failure to serve permits, all of which were outside of CMHA's control," which thus excused CMHA of responsibility. On appeal, Jindal challenges several of the trial court's findings concerning causation. Specifically, Jindal contends the trial court erred when it found that (1) July 26, 2016, not April 18, was the actual start date, (2) Jindal was unprepared to begin work on April 18, (3) the contract conditioned the commencement of Phase II on the completion of Phase I, and (4) the delay between April and November was not caused by CMHA. For ease in addressing these challenges, we divide the delay into three separate periods: (1) April 18 to July 26, (2) July 27 to October 17, and (3) October 18 to November 10, and consider each accordingly.

1.

{¶23} We turn first to the period between April 18 and July 26. According to Jindal, the triggering event for the seven-month delay occurred in April 2016, when CMHA issued its notice to proceed, advising Jindal to commence work on April 18, but CMHA failed to relocate the residents from the Phase II units. Disagreeing, the trial court identified July 26 as the start date, meaning that no delay existed between April and July that would enable Jindal to recover. In light of the competent, credible evidence supporting this finding, we agree. *See MRI Software*, 2018-Ohio-2190, 116 N.E.3d 694, at ¶ 10.

13

{¶24} At trial, CMHA's director of real estate and construction, Mr. Norton, maintained Jindal understood that the start date was July 26, testifying CMHA "told [Mr.] Jindal at that signing of the Notice to Proceed that he would not be starting until July." Following suit, CMHA's construction contract supervisor, Mr. Veley, testified that, not only did CMHA inform Jindal of the July start date, but the notice to proceed reflected as much. Specifically, Mr. Veley clarified that, although the notice declared April 18 as the start date, the notice also established July 26, 2017, (i.e., 465 days after April 18) as the completion date. Accordingly, because the contract contemplated completion within 365 days from the date advised in the notice to proceed, Mr. Veley explained, CMHA added a hundred days to the April 18 date (i.e., July 26) to allow 365 days for Jindal to complete the project— otherwise April 18, 2017, would have been the completion date reflected in the notice to proceed (instead of July 26, 2017). The parties thus understood this delay and agreed to it contractually.

{¶25} While Jindal counters with protestations that its officers lacked any memory of CMHA informing it of the July start date, Mr. Reams conceded that not only did Jindal fail to show up on April 18 with equipment ready to break ground, but between April and May it also never mustered any complaints about this "delay." Mr. Jindal echoed the point, acknowledging that Jindal issued no complaints the first few months (i.e., April, May, and June) regarding its inability to begin work on April 18 or shortly thereafter. This nonchalance about the delay in April, May, and June reinforces the conclusion that Jindal did not truly believe April 18 was the start date for its work on the Phase II units, all of which comports with the contractual time period contained in the agreement. Bolstering this point, Jindal also failed to tender the requisite notice as to this April to July period pursuant to section 30(c)(1). In fact, as discussed in more depth below, Jindal's first written

14

notification did not arrive until mid-August, well beyond the 20-day period beginning on April 18 when Jindal would have first discovered its inability to commence work.

**{¶26}** In light of the above, competent, credible evidence supported the trial court's finding that July 26 was the actual start date, not April 18. We accordingly conclude Jindal cannot recover any overhead damages for the period between April 18 and July 26.

2.

**{¶27}** As to the second interval, July 27 to October 17, we reach a different conclusion. Premised on a July 26 start date (as explained above), Jindal's work on Phase II nevertheless did not commence on this date. Siding with CMHA, the trial court blamed vandalism and relocation issues, as well as Jindal's failure to obtain permits, for this delay, deeming these issues "outside of CMHA's control." In doing so, the trial court found that the "[r]enovation and rehabilitation of the Phase I units needed to be completed first so that tenants in the Phase II units could be moved into them while the Phase II units were being renovated," and that the "vandalism of the Phase I units prevented CMHA from releasing Jindal to start work on the Phase II units[.]"

**{¶28}** Jindal mounts two challenges to the court's conclusions concerning this second period—the first contesting the court's determination that the commencement of Phase II was contingent upon the completion of Phase I, and the second, challenging the court's finding that the vandalism and relocation issues were out of CMHA's control. Turning to the former, Jindal asserts that nowhere in the contract does a provision exist conditioning the start of Phase II on the completion of Phase I. And we agree. One can search the contract in vain for any language conditioning Jindal's work on the Phase II units on Phase I's completion or on CMHA relocating the Phase II residents specifically to the

Phase I units.  CMHA certainly could have baked this condition into the contract, but it did not—and its efforts to reallocate the risk of loss at this juncture fall short.

{¶29} Reinforcing the point, other than some testimony from CMHA regarding an obscure "plan," the record is devoid of any evidence that Phase II's commencement was contingent on Phase I's competition (reflecting the contractual absence as well).  Nor was this something of which CMHA should have been unaware—it served as the general contractor for Phase I.  Absent a carve-out in the contract, no reason exists why Jindal should have understood that Phase I served as a type of prerequisite to launch Phase II.  To the extent that the trial court interpreted the contract to require that renovation of "the Phase I units needed to be completed first so that tenants in the Phase II units could be moved into them," we find that it erred.

{¶30} This brings us to Jindal's second challenge in regard to the July to October delay period—the court's conclusion that CMHA was not the sole cause of the delay.  Ordinarily, vandalism would seem to fall into the "any other cause" category under section 30, and therefore absolve CMHA of responsibility for the delay.  *See* Section 30(b) of the contract ("However, no adjustment shall be made under this clause for any * * * delay * * * to the extent that performance would have been so * * * delayed * * * by any other cause[.]"); *MW Builders,* 134 Fed.Cl. at 508, quoting (Emphasis sic.) *Triax-Pacific*, 958 F.2d at 354 ("[A] contractor may recover for an unreasonable delay, if the Government is 'the *sole* proximate cause of the contractor's additional loss, and the contractor would not have been delayed for *any other reason* during that period.' ").  But here, the vandalism did not occur to Jindal's contractually designated project, the Phase II units, but instead to a wholly separate project, the Phase I units.  We would likely reach a different result if vandalism damaged Phase II and prevented construction there from going forward.  Nevertheless, the

16

damage to the Phase I units cannot shield CMHA from fault in failing to relocate the Phase II residents here when, as discussed above, Phase I's completion held no bearing on Jindal's work on Phase II.

{¶31} Nor may CMHA seek to shift any blame for this delay to Jindal's failure to obtain permits. At trial, both of CMHA's employees conceded that relocation and vandalism caused the delay between July and October, with Mr. Norton admitting that the relocation of the Phase II residents and the vandalism to Phase I were "the only cause of delay," at least until CMHA released the Phase II units to Jindal on October 17. Further, both Mr. Norton and Mr. Veley agreed that Jindal's failure to obtain the necessary permits did not cause this period of delay. And Mr. Norton conceded that "CMHA [was] in control of the relocation," thereby recognizing CMHA's responsibility in relocating the Phase II residents. Needless to say, even if Jindal had the permits in hand, CMHA would not have allowed it to commence work prior to October 17.

{¶32} Therefore, we conclude that the court below erred when it determined that the vandalism to the Phase I units and the relocation of the Phase II residents fell "outside of CMHA's control" and that Jindal's failure to obtain permits caused the delay—at least with respect to this July to October period. Based on an application of the contract at hand to the facts of this case, we see no other cause "concurrent with the government-caused delay." *See George Sollitt Const. Co.,* 64 Fed.Cl. at 238 ("[E]ven if the government has caused an unreasonable delay to contract work, that delay will not be compensable if the contractor, or some other factor not chargeable to the government, has caused a delay concurrent with the government-caused delay."). We accordingly find that CMHA's failure to relocate the Phase II residents in order to enable Jindal to commence work solely caused the delay between July 27 and October 17. Therefore, Jindal may recover for overhead

damages incurred for this period pursuant to section 30 of the contract if it provided suitable notice (which we will address below).

3.

{¶33} As to the third temporal period (between October 18 and November 10), we find that Jindal bears at least some responsibility for this delay. As noted above, on October 17, CMHA released the Phase II units to Jindal to begin construction. But Jindal had yet to acquire the necessary permits for it to commence work. It did not acquire these permits until November 2, which prevented it from commencing work before November 10. Obtaining the permits fell on Jindal's shoulders, with the specifications in the contract designating this duty to the contractor. Further, at trial, Mr. Jindal admitted as much, conceding that the contract directed Jindal to acquire the permits and that CMHA would then reimburse Jindal for these costs. The delay between October and November was accordingly "the fault or negligence of" Jindal, not some act or failure to act by CMHA, thus barring Jindal from recovering overhead damages during this period under section 30 of the contract. *See* Section 30 of the contract ("However, no adjustment shall be made under this clause for any * * * delay * * * to the extent that performance would have been so * * * delayed * * * by any other cause, including the fault or negligence of the Contractor[.]").

{¶34} In sum, we conclude that Jindal cannot recover overhead damages for the first period between April 18 and July 26, since no delay occurred during this time, nor can it recover for the third interval between October 18 and November 10, as Jindal caused the delay for this period. This leaves the delay between July 27 and October 17 the only compensable period, as long as Jindal satisfied the notice requirements contained within section 30(c).

C.

{¶35} This brings us to the last hurdle Jindal must clear in order to recover overhead damages for the period of delay between July 27 and October 17—timely notice as outlined in section 30(c). Pursuant to section 30(c), a claim is not allowed

> (1) for any costs incurred more than 20 days before the Contractor shall have notified the Contracting Officer in writing of the act or failure to act involved (but this requirement shall not apply as to a claim resulting from a suspension order); and, (2) unless the claim, in an amount stated, is asserted in writing as soon as practicable after the termination of the * * * delay * * * but not later than the date of final payment under the contract.

{¶36} Although the parties debate whether this clause imposes two conjunctive requirements or disjunctive ones, the plain language settles this dispute, with section 30(c) obligating the contractor to comply with two separate notice requirements for timely filing its claim, as the case law confirms. *See Hoel-Steffen Constr. Co. v. United States*, 197 Ct.Cl. 561, 456 F.2d 760, 766 (1972) (holding that, because the board failed "to heed the different nature of the two separate notice requirements in the suspension clause," it ultimately erred when it found the contractor failed to timely submit its claim for the government-caused delay within the 20-day period). As to the first requirement, set forth in section 30(c)(1), the contractor cannot recover for costs incurred more than 20 days before the contractor should have notified the contracting officer in writing of the act or failure to act involved. Stated differently, once the contractor knows of the contracting officer's act or failure to act causing delay, section 30(c)(1) demands written notification to the contracting officer within 20 days. Consequently, section 30(c)(1) aims to place the contracting officer on notice that a condition exists that is delaying the contractor's performance, which then enables it to

remedy the situation. *See id.* (interpreting a nearly identical suspension of work clause mandating notice within 20 days to be directed "only at notification to the defendant 'of the act or failure to act involved.' ").

{¶37} On the other hand, section 30(c)(2) endeavors to quantify the contractor's claim, requiring the contractor to provide a "written monetary claim" detailing the costs incurred. *See id.* ("The latter of the two is that there must be a written monetary claim 'in an amount stated * * * as soon as practicable after the termination of such suspension, delay, or interruption[.]' * * * The other notice specification * * * is not directed at the presentation of a monetary claim in connection with the suspension clause, but only at notification to the defendant 'of the act or failure to act involved.' "). Notably, the contractor need not tender this "written monetary claim" within 20 days of experiencing the increased costs, but instead "as soon as practicable after the termination of" the delay.

{¶38} Interpreting section 30(c), the trial court here ultimately found that, because Jindal did not provide a written request for delay damages until December 2, 2016, section 30(c) barred Jindal from recovering any reimbursement for delay damages incurred. However, in doing so, the trial court conflated the two notice requirements, subjecting Jindal's "written monetary claim" to the 20-day requirement specified in section 30(c)(1). *See Hoel-Steffen* at 766 (finding the board erroneously transformed the 20-day notice requirement "into a provision for the filing by the contractor of a specific monetary claim under the suspension clause within 20 days of experiencing the increased costs."). But, as discussed above, Jindal needed only to submit written notification (not a full claim delineating costs incurred) within 20 days from when it should have notified CMHA of the outset of the delay. And this makes sense—the purpose of the first provision is to place the contracting officer on notice in order to ameliorate any damage, and it would be unrealistic

to expect the contractor to completely itemize all of its damages on such short notice (particularly when the harm might be on-going).

{¶39} Upon review of the record, we find that Jindal satisfied the notice requirements for the period between July 27 and October 17. As established above, July 26 represented the actual start date for Phase II. Jindal satisfied the 20-day notice requirement by sending various emails in mid-August notifying CMHA of Jindal's inability to begin work on Phase II and warning of the increased costs that would be incurred from this delay. Without receiving adequate responses from CMHA, Jindal continued to pepper it with notices of Jindal's objections to the delay and the specter of damages resulting from the delay throughout September.

{¶40} This constitutes sufficient written notice to CMHA under section 30(c). Once Jindal notified CMHA of this delay, CMHA had the ability to try to mitigate any damages and to try to resolve the delay. *See Hoel-Steffen*, 456 F.2d at 766 ("[The] inquiry is simply whether the contractor put the [g]overnment on notice of the government conduct complained about, so that the procurement officials could begin to collect data on the asserted increase in cost, and could also evaluate the desirability of continuing the delay-causing conduct."); *K-Con Bldg. Systems, Inc. v. United States*, 114 Fed.Cl. 595, 605 (2014), quoting *Calfon Constr., Inc. v. United States*, 18 Cl.Ct. 426, 438 (1989) (discussing the purpose of the written notification requirement is to inform the government contracting officer " 'before such time that the Government would suffer if not apprised of the facts.' "). Accordingly, we find that Jindal sufficiently notified CMHA under section 30(c)(1) of the contract.

{¶41} Turning to the latter requirement under section 30(c)(2), Jindal also needed to provide CMHA with a written monetary claim "as soon as practicable" after the

21

termination of the delay, but "not later than the date of final payment under the contract." As noted by the trial court, on December 2, 2016, Jindal submitted its first written monetary claim describing increased costs stemming from the delay. But this filing concerned increased expenses for future months, rather than the unabsorbed overhead costs that form the basis of this appeal. In fact, it was not until April 11, 2017, that Jindal provided a written claim quantifying the unabsorbed overhead costs arising out of delay between April 18 and November 10, 2016.

{¶42} Although this notice came five months after Jindal commenced work, based on the facts of this case, we find that Jindal tendered CMHA its written claim for overhead damages "as soon as practicable" after the termination of the delay pursuant to section 30(c)(2), especially in light of Jindal's hiring a CPA to calculate the overhead damages for the relevant period. *See Hoel-Steffen*, 456 F.2d at 766 (finding the contractor's $150,000 claim submitted a little over eight months after the termination of the delay satisfied the "as soon as practicable" requirement). Certainly, it tendered this claim well in advance of "final payment." Therefore, because Jindal satisfied the pair of notice requirements in regards to the delay period between July 27 and October 17, we find the trial court erred in concluding Jindal's claim was untimely under section 30(c).

D.

{¶43} Based on the above, we hold that Jindal may recover for overhead damages stemming from the CMHA-caused delay between July 27 and October 17, and accordingly remand the cause for the trial court to determine the amount of Jindal's overhead damages. As to how to calculate these overhead damages, we leave that to the able discretion of the trial court below, as Ohio courts do not compel any particular approach.

**{¶44}** On the one hand, Ohio courts, including the Ohio Supreme Court, have gravitated towards the *Eichleay* formula to calculate unabsorbed overhead costs arising out of government-caused delay. *See Triton Servs.*, 2019-Ohio-3108, 140 N.E.3d 1249, at ¶ 54, quoting *Complete Gen.*, 94 Ohio St.3d at 55, 760 N.E.2d 364 ("[*Eichleay*] is 'the most well-known formula for calculating unabsorbed overhead' costs arising out of government-caused delay."). Originally established in the context of federal government construction contracts, the *Eichleay* formula "creates a *per diem* rate for overhead costs attributable to a single project, multiplying that rate by the number of days of delay to arrive at a total home office overhead award." (Emphasis sic.) *Complete Gen.* at 58, citing *Wickham Contracting Co., Inc. v. Fischer*, 12 F.3d 1574, 1577 (Fed.Cir.1994), fn. 3. The *Eichleay* formula also carries two substantive prerequisites: the contractor must demonstrate that (1) it was on standby, and (2) it was unable to take on other work during this standby period. *Id.* at 58; *All State Boiler,* 146 F.3d at 1373-1375.

**{¶45}** However, as this court emphasized in *Triton Services*, the *Eichleay* formula is but one way to determine unabsorbed home-office-overhead damages. *See Triton Servs.* at ¶ 54; *Complete Gen.* at 61 ("We find today that the *Eichleay* formula is *one* way of determining unabsorbed home office overhead damages in public construction delay cases."). Consequently, a trial court maintains discretion in calculating overhead damages resulting from government-caused delay, with the *Eichleay* formula but one arrow in its quiver. *See J & H Reinforcing*, 10th Dist. Franklin No. 12AP-588, 2013-Ohio-3827, at ¶ 106 (holding the "*Eichleay* formula is discretionary," and thus "the referee acted within its discretion in applying a formula other than the *Eichleay* formula in calculating home office overhead damages."); *Wood Elec.*, 2017-Ohio-2743, 90 N.E.3d 371, at ¶ 36 (affirming the trial court's use of the HOOP formula when calculating overhead damages caused by delays

and finding no error in the trial court's failure to require proof of the *Complete Gen.* factors prior to considering the HOOP method).  We leave it to the trial court below on remand to calculate, within its discretion, Jindal's overhead damages arising out of the period of delay between July 27 and October 17 if the parties prove unable to stipulate to the amount.

IV.

**{¶46}**  For the forgoing reasons, we affirm in part and reverse in part the judgment rendered in favor of CMHA, and we remand the matter to the trial court.  Specifically, we affirm the portion of the trial court's judgment that found Jindal could not recover for overhead damages for the April 18 to July 26 and October 18 to November 10 periods, and we accordingly overrule Jindal's single assignment of error in this respect.  However, we reverse the court's conclusion that Jindal could not recover overhead damages for the period of delay between July 27 and October 17, and therefore, we sustain Jindal's sole assignment of error in part.  Therefore, in light of our disposition, we remand the cause for the trial court to calculate the overhead damages arising out of the CMHA-caused delay between July 27 and October 17.

Judgment accordingly.

**MYERS, P. J.,** and **WINKLER, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion